**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------x
: 
In re: : Chapter 11
: 
COLT HOLDING COMPANY LLC, *et al.*,[1] : Case No. 15-_____ (   )
: 
  Debtors. : Joint Administration Requested
---------------------------------------------------------------x

**DECLARATION OF NIKHIL MENON IN SUPPORT OF
DEBTORS' MOTION (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364,
AND 507 AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING, (B) GRANT SENIOR LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, AND (C) UTILIZE CASH
COLLATERAL OF PRE-PETITION SECURED PARTIES; (II) GRANTING
ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES
PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; (III) SCHEDULING A
FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

I, Nikhil Menon, hereby declare that the following is true to the best of my knowledge, information and belief:

1.   I am a Managing Director of Perella Weinberg Partners LP ("**PWP**") in the financial restructuring group and one of the lead restructuring advisors involved in these cases. PWP is the proposed financial advisor to Colt Holding Company LLC and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**" or "**the Company**"). PWP began working with the Debtors during the fall of 2014. I understand that the Debtors plan to file the *Debtors' Application for Entry of an Order Authorizing the Employment and Retention of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Colt Holding Company LLC (0094); Colt Security LLC (4276); Colt Defense LLC (1950); Colt Finance Corp. (7687); New Colt Holding Corp. (6913); Colt's Manufacturing Company LLC (9139); Colt Defense Technical Services LLC (8809); Colt Canada Corporation (5534) ; and Colt International Coöperatief U.A. (6822); CDH II Holdco Inc. (1782). The address of the Debtors' corporate headquarters is: 547 New Park Avenue, West Hartford, Connecticut 06110.

*Perella Weinberg Partners L.P. as Financial Advisor for the Debtors,* Nunc Pro Tunc *to the Petition Date* in the coming days.

2. I submit this declaration in support of the *Debtors' Motion (i) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 Authorizing the Debtors to (a) Obtain Postpetition Financing, (b) Grant Senior Liens and Superpriority Administrative Expense Status, and (c) Utilize Cash Collateral of Pre-Petition Secured Parties; (ii) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, And 364; (iii) Scheduling a Final Hearing; and (iv) Granting Related Relief* (the "**DIP Motion**").[2]

3. Unless otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' senior management or members of the PWP team, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial affairs. To the extent any information I disclose here requires amendment or modification, a supplemental declaration will be submitted to the Court. If I were called to testify, I would testify competently to the facts set forth here.

**QUALIFICATIONS.**

4. I received my Bachelor of Science in Business Administration in Management and Economics from Bucknell University in 2003. On graduation from Bucknell University, I started as an analyst at Bear Stearns in the Telecom, Media & Technology group, where I worked on mergers, acquisitions, and debt and equity financings. I joined PWP in June 2008 and was promoted to Managing Director in January 2015. While at PWP, I have worked on

---

[2] Capitalized terms not otherwise defined herein have the meanings set forth in the DIP Motion.

numerous M&A, financing, and restructuring advisory transactions. I hold Series 7 and Series 63 licenses.

5. The nature of my work for PWP has been primarily focused on bankruptcy and restructuring situations, representing debtors, creditors, and investors in distressed companies. Among other things, I advise companies with respect to corporate restructurings, recapitalizations, sale transactions, obtaining credit facilities, refinancings, and negotiations with interested purchasers, credit providers, and creditors, among other constituents. I have worked on a number of restructuring transactions, representing companies, creditors, potential purchasers and investors in both "out-of-court" transactions and Chapter 11 cases, including transactions for Anadarko Petroleum Corp./Tronox Ltd., Cengage Learning Inc., Choctaw Generation L.P., Houghton Mifflin Harcourt Co., OneComm, Reliance Industries Limited, School Specialty, Inc., Spectrum Brands, Inc., TPC and Vertis Communications, Inc., and others.

## THE PROPOSED DIP FACILITIES

6. The Debtors seek authority to obtain postpetition secured debtor in possession financing in an aggregate principal amount of up to $20,000,000.00 pursuant to the terms and conditions of the DIP Credit Agreements.

7. The DIP Lenders and the Prepetition Secured Parties have consented to the Debtor's use of cash collateral (as defined in Bankruptcy Code section 363(a), "**Cash Collateral**") and entry into the DIP Facilities.

### THE DEBTORS' AND THEIR PROFESSIONALS CONDUCTED DILIGENT SEARCH RESEARCH FOR ALTERNATIVE DIP FACILITY PROPOSALS.

8. In my capacity as financial advisor to the Debtors, I was actively involved in the arm's length negotiations that preceded execution of the DIP Credit Agreements discussed below. While the DIP Credit Agreements were being negotiated, I also contacted, on behalf of

the Debtors, a number of traditional asset-backed lenders, regional banks, and hedge funds to determine the terms of alternate post-petition financing. Many of these lenders would not consider lending to the Debtors because of institutional policies and public relations concerns related to lending to gun manufacturers.

9. Of the lenders that expressed an interest in providing post-petition financing to the Debtors, none offered terms that were as favorable, let alone more favorable, than the terms of the DIP Facilities. No lender was willing to provide financing backed by junior liens on the Debtors' collateral. Rather, all lenders insisted upon liens that would prime the existing liens under 364(d) of the Bankruptcy Code. Moreover, no lender offered economic terms more favorable than the DIP Facilities.

10. As no lender offered terms more favorable than the DIP Facilities, the Debtors chose to avoid lengthy and expensive litigation with the Prepetition Secured Parties, who are also the DIP Lenders. A priming fight would distract the Debtors from immediately implementing their 363 Sale Transaction and harm the Debtors and the estate.

11. Attached as Exhibit A hereto is a chart summarizing my efforts to contact third parties in an attempt to obtain financing on terms more favorable than the DIP Facilities.

### APPROVING THE DIP FACILITIES IS IN THE ESTATES' BEST INTERESTS AND THE TERMS OF THE DEBTORS' DIP FACILITIES ARE COMMERCIALLY REASONABLE.

12. Given the Debtors' urgent need to obtain financial stability for the benefit of all parties in interest in these chapter 11 cases, as well as my analysis of the DIP Facilities' terms, I believe that approving the DIP Facilities is necessary to preserve value for the estates and their creditors. Without the incremental liquidity the Debtors will receive under the DIP Facilities, the Debtors' ability to manufacture the products that generate revenues for the Debtors would be critically hindered.

13. The terms of the DIP Facilities, in my opinion, are fair and reasonable, and approval of the DIP Facilities is in the best interests of the Debtors, their estates, and their creditors. For example, the DIP Facilities' interest rate of 12.5% is reasonable when compared to loans of a similar size extended to borrowers who are similarly situated to the Debtors. In addition, the DIP Facilities' milestones provide the Debtors with time to achieve their goals in these cases while not unduly running the risk of tripping a default under the DIP Facilities. The fees and other terms are also commercially reasonable based on my experience and knowledge of the Debtors' business affairs, the market for loans of similar sizes and types, and the manufacturing industry generally.

14. The fairness of the terms of the DIP Facilities are further evidenced by their negotiating history. The DIP Facilities are the result of an extensive, good-faith, arms-length negotiation between the Debtors, the DIP Lenders, and the Prepetition Secured Parties, each of whom was represented by experienced counsel and financial advisors. None of the DIP Lenders or Prepetition Secured Parties are affiliates of the Debtors or are otherwise insiders. As I discuss above, the Debtors also considered alternatives to the DIP Facilities, ultimately rejecting all of them for the reasons discussed above.

15. The DIP Facilities also have the highest certainty of closing among all of the options for postpetition financing the Debtors considered because, among other things, the Prepetition Secured Parties have consented to the DIP Facilities and the Debtors were already indebted to the DIP Lenders, which incentivized them to provide financing to protect their economic interests. The DIP Agents and the DIP Lenders also have a substantial base of knowledge with respect to the Debtors' business, their capital structure, and the Prepetition Collateral, increasing the certainty that the DIP Facilities would close on the timetable necessary

to maximize the value of the estates.  In contrast, other lenders do not have a deep familiarity with the Debtors' business, making it less likely that an alternative loan from them would close in a timely fashion.  As a result, I believe the Debtors' decision to enter into the DIP Facilities is reasonable and appropriate.

**THE PREPETITION SECURED PARTIES
CONSENT TO THE DIP FACILITIES AND
THE APPROPRIATENESS OF THE ADEQUATE
PROTECTION PACKAGE.**

16.     The Prepetition Lenders' consent to the DIP Facilities benefits the estates because it avoids potential costly and expensive litigation.  Because substantially all of the Debtors' cash is encumbered by the liens securing the Prepetition Loan Agreements, the Prepetition Lenders' consent to use this cash is necessary unless the Debtors can show they are adequately protected.

17.     The Debtors have agreed to provide an adequate protection package to the Prepetition Secured Parties as holders of secured claims that will be primed, solely to the extent that the Prepetition Collateral diminishes in value after the Petition Date, in exchange for the Debtors' use of the Prepetition Collateral that is appropriate under the circumstances.  This consensually negotiated package includes the forms of adequate protection set forth in section 361 of the Bankruptcy Code solely to the extent of any diminution in value of the Prepetition Collateral, including (i) the payment of cash interest, (ii) the repayment of reasonable fees and expenses under the Prepetition Credit Documents, (iii) replacement security interests and liens, subject to the terms of the DIP Intercreditor Agreement, (iv)  superpriority administrative claims under section 507(c) of the Bankruptcy Code, subject to the payment in full in cash of amounts due under the Carve-Out, the DIP Obligations and the DIP Superpriority Claims, and (v) access to books and records of the Debtors.  The terms of this adequate protection package are

commercially reasonable based on my experience and knowledge of adequate protection packages.

18.     If the Debtors had obtained postpetition financing from a party other than the DIP Lenders, there is a risk that the Prepetition Lenders would argue that they do not have a sufficient equity cushion in the Debtors' assets for the Debtors to adequately protect them without protection payments in excess of those proposed under the DIP Facilities given the Debtors' existing debt obligations and liquidity constraints.  Such an argument would result in costly and distracting litigation , which may have a negative impact on the Debtors ability to continue their normal operations with their customers, vendors, suppliers and employees.  Thus, by obtaining the Prepetition Lenders' consent to the DIP Facilities and the use of Cash Collateral, the Debtors can preserve liquidity and avoid protracted and costly litigation at the outset of these cases.

*     *     *

19.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 14, 2015
         New York, New York

_____
                Nikhil Menon

**EXHIBIT A**

| # | Lender | Status | Comments |
|---|--------|--------|----------|
| **Traditional ABL Facility Lenders** | | | |
| 1 | ABL Lender A | Passed | Passed due to franchise issues (industry) |
| 2 | ABL Lender B | No Response | Left detailed voicemail; no response; had discussed with them during ABL financing and needed collateral coverage |
| 3 | ABL Lender C | Passed | Not interested in providing a DIP |
| **Regional Banks** | | | |
| 4 | Regional Bank A | No Response | Left detailed voicemail; no response |
| 5 | Regional Bank B | No Response | Left detailed voicemail; no response |
| 6 | Regional Bank C | No Response | Left detailed voicemail; no response; had discussed with them during ABL financing and cash flow was an issue |
| 7 | Regional Bank D | No Response | Left detailed voicemail; no response; had discussed with them during ABL financing and franchise was an issue |
| 8 | Regional Bank E | Passed | Passed due to franchise issues (industry) |
| 9 | Regional Bank F | No Response | Left detailed voicemail; no response |
| 10 | Regional Bank G | Passed | Passed due to franchise issues (industry) |
| **Hedge Funds** | | | |
| 11 | Hedge Fund A | No response | Left message |
| 12 | Hedge Fund B | Interested/ Need Priming/ Asset-Based | Need to be Asset-based facility; 8% to 9% interest plus upfront fees of 200-300 bps. 90-day duration too short - would therefore need to figure out their role at exit |
| 13 | Hedge Fund C | Interested/ Need Priming | Would need priming. Returns in low-teens |
| 14 | Hedge Fund D | Interested/ Need Priming | Need priming and low-teen returns. Would prefer to do a full take-out of existing secured given DIP size is small |
| 15 | Hedge Fund E | No response | Left message and voicemail |
| 16 | Hedge Fund F | Interested/ Need Priming | Unlikely to be more attractive cost of capital (mid-teens returns) than existing, need priming |