**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x
                                                  :
In re:                                            :    Chapter 11
                                                  :
COLT HOLDING COMPANY LLC, *et al.*,               :    Case No. 15-_____ (   )
                                                  :
                                   Debtors.       :
                                                  :    Joint Administration Requested
-------------------------------------------------------------x

**KEITH A. MAIB'S DECLARATION IN SUPPORT**
**OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Keith A. Maib, declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Colt Defense LLC ("**Colt**"), which, together with the other Debtors (defined below), is one of the world's oldest and most iconic designers, developers, and manufacturers of firearms for military, law enforcement, personal defense, and recreational purposes and was founded over 175 years ago by Samuel Colt, who patented the first commercial successful revolving cylinder firearm in 1836 and began supplying U.S. and international military customers with firearms in 1847.  Colt is incorporated in Delaware and headquartered in West Hartford, Connecticut.  On the date hereof, Colt, together with certain of its affiliates (collectively, the "**Debtors**" or the "**Company**"))[1] commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Colt Holding Company LLC (0094); Colt Security LLC (4276); Colt Defense LLC (1950); Colt Finance Corp. (7687); New Colt Holding Corp. (6913); Colt's Manufacturing Company LLC (9139); Colt Defense Technical Services LLC (8809); Colt Canada Corporation (5534); Colt International Coöperatief U.A. (6822); CDH II Holdco Inc. (1782). The address of the Debtors' corporate headquarters is: 547 New Park Avenue, West Hartford, Connecticut 06110.

(the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").[2]

2.    I have served as Chief Restructuring Officer ("**CRO**") of Colt since March 11, 2015. In this capacity, I have provided operational advisory services to the Debtors and have played a central role in the Debtors' pursuit of a consensual restructuring of its outstanding debt.

3.    I am a Senior Managing Director at Mackinac Partners LLC ("**Mackinac**"), a financial advisory and turnaround management firm and have over 25 years of diversified business experience including serving as a partner in two international accounting firms. I have extensive experience in guiding companies through periods of change and turmoil and am nationally recognized as a leading turnaround executive. Prior to joining Mackinac, I was the Chief Restructuring Officer of AgFeed USA, LLC (international pork products); Interim Chief Operating and Marketing Officer for Sunterra Corporation (hospitality, vacation ownership development, and marketing); Interim Chief Financial Officer of Norwood Promotional Products (consumer and promotional products); Chief Executive Officer of Worldnet Communications, Inc. (telecommunications); Chief Executive Officer of PennCorp Financial Group, Inc. (financial services and insurance); Chief Financial Officer of Acordia, Inc. (financial services and insurance brokerage); and Chief Operating Officer of Borland International, Inc. (technology and software development). Prior to these roles, I was a partner in the restructuring practice at Price Waterhouse where I was employed from 1981 to 1994. I was also a partner at Coopers & Lybrand responsible for their southwest region restructuring practice from 1994 – 1996. I was previously a CPA licensed to practice in Missouri and Texas, and I hold a Bachelor of Business Administration from the University of Kansas. AgFeed, Norwood, and Worldnet all involved

---

[2] Colt Canada Corporation intends to file a recognition proceeding in Canada under Part IV of the Companies' Creditors Arrangement Act.

section 363 sales approved by bankruptcy courts. PennCorp was a consensual prepackaged chapter 11 case before the U.S. Bankruptcy Court for the District of Delaware.

4.      In my capacity as Chief Restructuring Officer, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, corporate history, and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management and advisors, including advisors from Mackinac Partners, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration.  I am also authorized to submit this Declaration on behalf of the Debtors.

5.      As will be explained in detail below, the Debtors have solicited acceptances for a prepackaged chapter 11 plan of reorganization (the "**Initial Prepackaged Plan**") from holders of its 8.75% Senior Notes due 2017 (the "**Senior Notes**") and an amended prepackaged chapter 11 plan of reorganization (the "**Amended Prepackaged Plan**").  The voting deadline on the Amended Prepackaged Plan expired on June 12, 2015.  Based on the results of the solicitation, the Debtors have determined that confirmation of the Amended Prepackaged Plan is not possible and therefore have filed the Sale Motion (defined below) to facilitate an expeditious sale of substantially all of the Debtors' assets as a going concern (the "**Sale Transaction**") and to ensure the continuation of their business.

6.      The Company's present situation concerning customer confidence and its ability to meet current customer demands for finished rifles and handguns is fragile.  Paramount among the needs and sensitivities of the Company's key customers has been continued assurance

of timely delivery of finished products without compromising quality.  One must understand that the Company is obligated to the U.S. Government to deliver product at "ramped up" rates by year end, which directly ties into the Company's business plan forecast.  Critical to meeting rifle and handgun delivery obligations to the U.S. Government is obtaining parts from suppliers uninterrupted.  Over the last nine months the Company's liquidity issues have done damage to its supply chain.  The Company is subject to significant scrutiny from the U.S. Government related to its ability to meet delivery commitments, particularly with regards to the M240B and M240L medium machine guns and spare and replacement parts.  Any further deterioration in the Company's financial situation will put additional stress on the availability of critical raw materials and parts and could result in the loss of significant business from the U.S. Government. In addition, the Company's sales to foreign governments would be negatively impacted by any loss of sales to the U.S. Government because foreign governments seek to purchase rifles from gun manufacturers that make such products for the U.S. military.  As will be discussed below, approximately 40% of the Company's consolidated revenues are attributable to the U.S. government and foreign governments.

7.    It is virtually certain to me that unless the Debtors' chapter 11 filings convey a clear and convincing message to their customers and vendors that the Company's financial issues will be solved in these proceedings swiftly, the Company may lose U.S. and foreign government business that could lead to a significant diminution in the Company's value. Based on the foregoing the Company will not survive protracted chapter 11 litigation and delay; the best path forward for the Company and its stakeholders is approval on an expedited basis of the Sale Transaction.  The only other alternative is a chapter 7 liquidation of the Debtors' assets that would substantially diminish asset value, curtail the critical delivery of weapons to military

and law enforcement agencies around the world, leave nearly 800 employees out of work, cause the termination of health benefits and jeopardize retiree benefits for current and former employees, yield unsecured creditors (including trade creditors and vendors) potentially little or no recovery, and eliminate a viable business that generates tax revenue and for the West Hartford, Connecticut community.

8.      On today's date (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under the Bankruptcy Code.  I submit this Declaration to describe the Debtors' background, the circumstances that led to the Debtors' chapter 11 filings, and the Debtors' goals in these cases.  I also submit this Declaration in support of relief the Debtors have requested in "first day" applications and motions filed with the Court (collectively, the "**First Day Pleadings**"). The relief sought in the First Day Pleadings is intended to help assist the Debtors to continue to operate effectively, minimize potential adverse effects of filing bankruptcy, and ease the administrative burden of operating in chapter 11.  I am familiar with each of the First Day Pleadings, and I believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.

9.      **Part I** of this Declaration provides a description of the Debtors' businesses, organizational structure, and prepetition indebtedness. **Part II** describes the facts that led to these chapter 11 cases and the Debtors' goals and intentions in these cases. **Part III** summarizes the First Day Pleadings and explains why the relief requested is appropriate and necessary.

**<u>OVERVIEW</u>**

10.     Since my retention on March 11, 2015, I have played a central role in the Debtors' pursuit of a consensual restructuring transaction.  What has been self-evident to me from the outset of my engagement is the fact that the Company is suffering from an over-levered capital structure that has resulted in ongoing liquidity constraints.  Moreover, the burdens of existing public reporting requirements have diverted a vast amount of time, money, and energy away from solving for operational inefficiencies.  While a great deal of progress has been made in improving the Company's operations, the liquidity issues caused by the excessive amount of debt on its balance sheet remains an overriding problem.

11.     For the reasons discussed below, I strongly believe that unless the Company solves its liquidity issues and de-levers its capital structure through an expedited section 363 sale of the business as a going concern, the Company will simply not survive, and the Debtors will be forced to convert these chapter 11 cases to chapter 7.  In other words a protracted chapter 11 case is not sustainable.

**A.     Capital Structure and Obligations**

12.     The capital structure of the Company is relatively straightforward.  The Company's secured debt consists of a $72.9 million term loan (secured by a first lien on intellectual property and a second lien on all other assets), a $35 million senior loan (secured by a second lien on intellectual property and a first lien on all other assets), and $250 million in 8.75% Senior Notes due 2017.

13.     The Company operates out of facilities located in the U.S. and Canada.  U.S. operations occur primarily at a facility located in West Hartford, Connecticut that is leased to the Company by NPA Hartford LLC, (the "**Landlord**"), which is a party related to and managed by an affiliate of the Sponsor (defined below).  This lease (the "**West Hartford**

**Facility Lease**") is set to expire on October 25, 2015.[3]  Canadian operations occur at a facility owned by one of the Debtors' Canadian subsidiaries.

14.    The Company is also managed by its equity sponsor Sciens Capital Management (the "**Sponsor**") pursuant to two consulting agreements.  Under a July 2007 financial advisory agreement the Company pays Sciens Management LLC an annual aggregate retainer of $330,000.  This fee is payable monthly in advance.  Under a July 2013 consulting service agreement the Company pays Sciens Institutional Services LLC an annual aggregate fee of $650,000 payable quarterly in advance.

15.    During the second half of 2014 the Company continued to experience slow sales across all of its core business channels (commercial, U.S. Government, and international).  Commercial sales were off from a commercial sales bubble in 2013 driven by fears of increased future regulation .  International sales were soft in 2013, given the maturation of a large contract with a Malaysian customer and relatively soft sales to the Canadian government.  U.S. Government sales were also slow due to production issues Colt was experiencing with the M240 medium machine gun and the lack of a new M4 carbine contract.

16.    Liquidity pressures continued to grow in the second half of the year as lower sales volumes did not cover the Company's fixed overhead costs.  In order to service the Company's $11 million Senior Notes interest payment due in November, Colt was forced to draw down on a large portion of an existing ABL facility and stretch out payments to critical raw material and parts suppliers.  A byproduct of extending out payments to trade creditors in the second half of 2014 was a dampening of the Company's 2015 projected growth as suppliers slowed sales to Colt to manage their credit risk profile.

---

[3] The Debtors have been advised by counsel to the Landlord that the final decision regarding any lease extension or renewal, or the final decision for a tenant will be made by an independent member of the Landlord.

## B.      Secured Debt Refinancings

17.      As of October 2014, the Company's secured obligations included an ABL facility and a term loan.  The Company established a goal of refinancing its secured debt as liquidity constraints raised the strong likelihood of a default that would have precipitated an accelerated chapter 11 filing.   Therefore, in November 2014, the Company first sought and obtained a refinancing and expansion of the existing term loan through a new term loan (the "**Term Loan**") governed by that certain Term Loan Agreement, dated November 17, 2014 (the "**Term Loan Agreement**"), among Colt Defense, Colt Finance Corp., New Colt Holding Corp., Colt's Manufacturing Company, LLC, and Colt Canada Corporation, as borrowers, certain subsidiary guarantors, Wilmington Savings Fund Society, Fsb., as agent, and the lenders party thereto (the "**Term Loan Lenders**").  The Term Loan, which closed on November 17, 2014, provided the Company with additional liquidity, allowed it to make the November 17 interest payment due to the holders of the Senior Notes, and provided the Company with flexibility in several respects under the Term Loan Agreement.

18.      Unfortunately, the Company's liquidity issues did not substantially improve following the November 17, 2014 refinancing.   Compounding the problem were excessive borrowing base restraints imposed by the agreement governing the ABL facility.  Again faced with the specter of a default under its secured loan debt, the Company sought and obtained a refinancing of the ABL facility through a new senior loan (the "**Senior Loan**") governed by that certain Credit Agreement dated February 9, 2015 (the "**Senior Loan Credit Agreement**"), among Colt Defense, Colt's Manufacturing Company, LLC, and Colt Canada Corporation, as borrowers, certain subsidiary guarantors, Cortland Capital Market Services LLC, as agent, and the lenders party thereto (the "**Senior Loan Lenders**" and together with the Term Loan Lenders, the "**Prepetition Secured Lenders**").   The Senior Loan Credit Agreement

removed the existing borrowing base restrictions and generally provided the Company with additional flexibility and liquidity.

### C.    Efforts to Restructure the Senior Notes

19.    After completion of the February 9, 2015 refinancing, it became apparent to the Company that a restructuring of the Senior Notes was essential in light of the ongoing $22 million in annual cash interest payments and looming 2017 maturity of $250 million. Accordingly, the Company began pursuit of a process whose goal was a consensual agreement with holders of its Senior Notes (collectively, the "**Senior Noteholders**").  However, dealing with this noteholder group was complicated by a clear divide in the nature of its constituents. Approximately one-fourth of the outstanding principal amount of the Senior Notes (approximately $61 million) are held by retail "mom and pop" holders that total approximately 2,700 in number (the "**Retail Holders**").   The remaining balance of the Senior Notes (approximately $189 million) are held principally by institutional holders (the "**Institutional Holders**"), many of whom purchased the notes in the secondary market.  I believe there are less than 50 Institutional Holders of the Senior Notes.

20.    The composition of the Senior Noteholder group was a substantial factor in the Company's decision to launch the Offer to Exchange, Consent Solicitation Statement, and Disclosure Statement Soliciting Acceptances of a Prepackaged Plan of Reorganization on April 14, 2015 (the "**Offer to Exchange and Disclosure Statement**") simultaneously to all Senior Noteholders, including Retail and Institutional Holders.  This Offer to Exchange and Disclosure Statement set forth a proposal that offered value to all Senior Noteholders in the form of new third lien notes at an exchange rate above then current trading prices.

### D.    Bondholder Due Diligence

21.    After launch of the Offer to Exchange and Disclosure Statement, the Company's professionals and management team immediately sought out and engaged in discussions with the professional advisors representing a steering committee of Institutional Holders (the "**Steering Committee**"), paid $300,000 for fees and expenses incurred by such advisors (the "**Steering Committee Advisors**"), and hosted several of the Institutional Holders and their advisors during multiple onsite visits at the West Hartford Facility (defined below). The Steering Committee Advisors were also given access to hundreds of important documents through a dataroom created by the Company and the opportunity to engage with the Company's management team, who worked diligently to respond to additional questions.    Additionally, certain Institutional Holders that signed a non-disclosure agreement were able to review a ninety page due diligence memo prepared by their legal advisors and a separate presentation and analysis concerning the Debtors' financial operations and status (collectively, the "**Due Diligence Materials**") prepared by their financial advisors.    In an effort to assist and cooperate with the Steering Committee Advisors in connection with this process, the Company's management team extended significant time and energy reviewing the Due Diligence Materials on multiple occasions and provided input to the Steering Committee Advisors regarding accuracy and completeness.

### E.    Additional Restructuring Efforts

22.    The Steering Committee Advisors submitted to the Company a restructuring counter-proposal (the "**Noteholder Counterproposal**") at a meeting held on May 7, 2015 that is discussed below (see paragraphs 58 and 59).    During that meeting the Steering Committee Advisors informed the Company on behalf of the Steering Committee that there was

absolutely no interest in the Company's Prepackaged Plan.[4]   In an effort to the bridge the differences between the Company's Prepackaged Plan and the Noteholder Counterproposal, the Company invited certain of the Institutional Holders and their financial advisor to a meeting on Saturday, May 16, which lasted most of the day.  I attended that meeting, along with Mr. Derron Slonecker on behalf of the Company, as well as Mr. Daniel Standen in his capacity on behalf of the Sponsor.  In my view progress was made at this meeting towards achieving the framework for a consensual deal with the Institutional Holders.  During the following two week period, the Company reviewed its financial projections and sought to determine how better to improve upon the Prepackaged Plan for the Senior Noteholders and engaged its Senior Lenders in intensive discussions seeking their support for an amended plan of reorganization.

23.    As a result of these discussions, a restructuring support agreement (the "**RSA**") was executed by the Company, its Prepetition Secured Lenders, its Sponsor, and the Landlord on May 31, 2015.  The restructuring term sheet attached to the RSA set forth the terms of debtor in possession loans and exit facilities that would both finance these chapter 11 cases and provide for a refinancing of the Company's secured debt on the effective date of the plan.  The RSA also contained an indication from the Sponsor to contribute $5 million in incremental capital in the form of preferred equity, an increase in the amount of new secured notes offered to the Senior Noteholders by approximately $34 million, and other features intended to address the requests of the Steering Committee.

24.    The terms of the RSA were incorporated into the amended Offer to Exchange and Disclosure Statement (the "**Amended Offer to Exchange and Disclosure**

---

[4] As of May 11, 2015, the initial deadline to tender Senior Notes into the exchange offer and vote on the Initial Prepackaged Plan, holders representing approximately 77% of the total number of holders of Senior Notes who actually voted on the Initial Prepackaged Plan accepted, indicating strong support from Retail Holders; but 94.9% in amount of the Senior Notes rejected the Initial Prepackaged Plan, which was plainly dominated by voting Institutional Holders controlling large blocks of Senior Notes.

**Statement**") pursuant to a supplement filed on June 1 (the "**June 1 Amendment**").  On the Sunday prior to launch of the June 1 Amendment, copies of the RSA, restructuring term sheet attached to the RSA, Amended Offer to Exchange and Disclosure Statement, and Amended Prepackaged Plan were provided to the Steering Committee Advisors in the hopes of continuing a productive dialogue.  Unfortunately, no formal reaction or response was received by the Company or its Advisors from the Steering Committee Advisors or any of the restricted Institutional Holders.  More disturbing was the leakage of confidential information contained in the RSA in the form of two Debtwire articles that inaccurately described the status of events and created disarray and confusion for the Company's customers, most notably the U.S. Government, and vendors and other service providers.

25.    As described below, the Amended Offer to Exchange and Disclosure Statement and Amended Prepackaged Plan sought to deliver new debt to the Senior Noteholders on a fair and equal basis and rejected the notion that the Institutional Holders should reap a disproportionate benefit to the exclusion of the Retail Holders.  Notably, the Amended Prepackaged Plan had support from the Landlord, as reflected in paragraph 5 of the RSA, with respect to the extension of the West Hartford Facility Lease.  On June 12, 2015, the Amended Prepackaged Plan was accepted/rejected along approximately the same percentages relating to number and amount of holders of the Senior Notes that voted on the Initial Prepackaged Plan.

**F.    363 Sale Process**

26.    In the face of the potential stalemate caused by rejection of the Amended Prepackaged Plan and the need for an expedited section 363 sale process, the Company directed its investment banker PWP Weinberg Partners ("**PWP**") to prepare a list of potential buyers for the Company's assets and to prepare an informational package for interested parties and non-

disclosure agreement for interested parties requiring additional information.  The goal of these marketing efforts is to allow for the immediate launch of a robust and transparent sales process.

27.     As noted below, the Company has filed a motion (the **"Sale Motion"**) requesting approval of bidding procedures that would govern an expedited sale of substantially all of its assets under section 363 of the Bankruptcy Code.  The inability to move forward with a confirmable plan presents the Company with an intractable stalemate that jeopardizes the Company's ability to survive as a going concern.  The dilemma confronting the Company after its two good faith unsuccessful attempts to achieve a consensual prepackaged plan of reorganization is how to best preserve its business as a viable going concern while at the same time setting forth a process that will allow the for the most expeditious, effective, efficient, and fair way for the Company and its constituencies to bridge their fundamental disagreements.  In my view, resorting to a battle of dueling plans sponsored by warring factions would be extremely costly and confusing to the Debtors' vendors, suppliers, employees, and customers.  Instead, good and sufficient business reasons exist to avoid the plan process in favor of an expeditious section 363 sale that is fair and transparent.  The factors that support a "good business reason" for allowing an accelerated section 363 sale in these cases include (i) the fragility of the Company's business and the need for a clear path forward for emergence from chapter 11, (ii) a section 363 sale would open the process to widespread parties bidding from any interested party, including strategic and financial buyers, (iii) a section 363 process would focus the parties' efforts towards determining what is the highest and best offer for the Company's business, and (iv) a section 363 process will offer more potential tenant alternatives and creative solutions to the Landlord as a party to the West Hartford Facility Lease.

28.     Notably the Company's Prepetition Secured Lenders strongly endorse an expedited sale process, as reflected in the milestone dates contained in the credit agreements governing the DIP Facilities (defined below).

29.     With respect to moving forward with the 363 sale process, it is extremely important that the quick selection of a stalking horse bidder (i) capture the confidence of the Company's employees, vendors, union, customers, and government contractors (all of whom are essential to the Company's viability and long term success) and (ii) serve as a basis to foster competitive bidding.  It comes as no surprise that the Sponsor indicated its willingness to make a stalking horse bid for the Company, given the Sponsor's integral involvement with and commitment to the Company over the last 10 years and in the restructuring of the Company over the last year.  However, because the Sponsor is plainly an insider of the Company, the Chairman of the Board Mr. Standen requested the Governing Board consider the formation of an independent committee with respect to the 363 sale process.  As a result, the Governing Board of Colt Defense LLC (the "**Governing Board**") appointed a committee of independent directors (the "**Independent Committee**") and vested the Independent Committee with decision making authority for the Governing Board with respect to all aspects of the 363 sale process.

30.     The Independent Committee selected and approved the Sponsor as the stalking horse bidder believing that its bid will give Colt an attractive opportunity in terms of uninterrupted continuity of the Company's business, which is clearly important to all of Colt's constituents including employees, customers, and contractors and provides a baseline bid that offers the Company the best chance for a successful and quick emergence from chapter 11.

31.     I wish to emphasize and make clear that my urgent call for the Company to emerge from chapter 11 on an expedited basis does not emanate in any way from strategic

design or advantage.  Without assigning blame, the liquidity problems facing the Company are real and represent a major stumbling block to achieving long term growth and viability.  At this point in time, the 363 sale process, as supported by its Prepetition Secured Lenders, represents the Company's best hope to de-lever its balance sheet and solve for its liquidity issues in rapid fashion.  Therefore, in my view it is imperative that the sale process result in conclusion of the Sale Transaction within 60 to 90 days.

## I.    DESCRIPTION OF THE DEBTORS

### A.    History of the Company

32.    The Debtors are one of the world's oldest and most renowned designers, developers, and manufacturers of firearms for military, law enforcement, personal defense, and recreational purposes. The Company's founder, Samuel Colt, patented the first commercially successful revolving cylinder firearm in 1836 and, in 1847, began supplying U.S. and international military customers with firearms that have set the standards of their era.

33.    Today, the Company's end customers encompass every segment of the worldwide firearms market, including U.S., Canadian and foreign military forces, global law enforcement and security agencies, consumers seeking personal protection, the hunting and sporting community and collectors.  From the Model P ''Peacemaker'' revolver to the 1911 automatic pistol, the M16 rifle and the M4 carbine, "Colt'' defines iconic firearms that first established worldwide military standards and then become the guns every law enforcement officer and serious recreational shooter wants to own.  The Colt-designed M16 rifle and M4 carbine have also served as the principal battle rifles of the U.S. Armed Forces for the last 50 years and are currently in military and law enforcement service in more than 80 countries around the world.

B.      **The Debtors' Businesses and Customer Base**

34.      As noted above, the Debtors are uniquely dependent on relationships with foreign and domestic military customers.   During 2014, 8% of the Debtors' consolidated revenues were attributable to the U.S. Government, with 32% attributable to sales to international customers and 59% attributable to domestic commercial and law enforcement customers.  Additionally, nearly all of the Company's sales to foreign and domestic militaries are made under indefinite delivery, indefinite quantity contracts.  These contracts generally contain low minimum order provisions and result from a highly competitive bidding process.

35.      In providing operational advisory services to the Debtors, I have been actively involved in discussions with the Debtors' military customer base.  The Debtors are extremely appreciative that these customers have continued to work with the Debtors despite the Company's recent restructuring efforts and understand their customer's concerns that protracted bankruptcy cases will jeopardize the Debtors' ability to fulfill existing and new orders on a timely basis.

C.      **1992 Chapter 11 Proceeding**

36.      In 1992, Colt Manufacturing Company ("**CMC**"), at the time the Company's principal operating subsidiary, filed chapter 11 petitions in the U.S. Bankruptcy Court for the District of Connecticut.  After the filing, which was precipitated by excessive debt and a loss of key military and police orders, CMC languished in chapter 11 for over two years while key government customers continued to send purchase order to competitors. In 1994, an investment by Zilkha & Co. allowed CMC to confirm a chapter 11 plan and emerge from bankruptcy.  It is my understanding that sometime after 1994, majority ownership of the Company transitioned from Zilkha & Co. to Sciens Capital Management, a New York City

investment firm founded by John P. Rigas, who was a partner at Zilkha & Co. at the time of the 1994 investment.

### D.    The Debtors' Current Corporate Structure

37.    The Company's current corporate structure is the result of two significant recent transactions.  First, on July 12, 2013, the Company acquired 100% ownership (the "**Merger**") of New Colt Holding Corp. ("**New Colt**"), at the time a privately-held affiliate manufacturing Colt's commercial handguns and providing a sales channel to Colt Defense LLC ("**Colt Defense**") for commercial rifles.  New Colt and its subsidiary CMC had been separated in 2003 from Colt Defense, which manufactured rifles and other products for military and law enforcement customers.  As a result of the Merger, the two manufacturers of Colt firearms were consolidated into a single enterprise providing the Company direct access to the commercial market for our rifles and carbines, ownership of the Colt brand name and other related trademarks, certain technology, and production capabilities for the full line of Colt handguns.

38.    Additionally, in March 2015, the Governing Board authorized the Company to undertake certain steps to create a more cost effective and efficient organizational structure for tax purposes (the "**Tax Reorganization**").  Prior to the Tax Reorganization, Colt Defense, the Company's principal operating subsidiary, had historically elected to be treated as a partnership for tax purposes.  This treatment required Colt Defense to make tax distributions to its members at the highest individual marginal tax rate.  As a result of the Tax Reorganization, Colt Defense reduced its obligation to make tax distributions to its members and will now make tax distributions to its corporate parent based on a corporate effective tax rate of approximately 40% (as compared to approximately 51% effective tax rate paid historically).  Colt Defense will also now be able to reduce its tax distribution requirement by factoring all allowable interest deductions (and not disregard interest on debt that funded distributions to investors), which will

eliminate Colt Defense's requirement to accrue tax distributions related to interest on debt funded distributions.

39.    An illustration of the Company's organizational structure following the Tax Restructuring is attached to this Declaration as Exhibit A.

**E.    Prepetition Indebtedness and Capital Structure**

40.    The primary components of the Debtors' capital structure are described in greater detail below.

*(a)    Funded Debt*

41.    As of the Petition Date, the Debtors had funded debt outstanding of approximately $357,900,000, consisting of the principal balance under the Senior Loan Credit Agreement, the Term Loan Agreement, and the Senior Notes Indenture (each as defined below). The following table summarizes the Debtors' prepetition long-term indebtedness:

| Indebtedness | Principal Amount (as of Petition Date) | Maturity Date |
|---|---|---|
| Senior Loan | $35,000,000.00 | 8/15/2018 |
| Term Loan | $72,900,000.00 | 8/15/2018[5] |
| Senior Notes | $250,000,000.00 | 10/15/17 |

*(b)    Term Loan Facility*

42.    On November 17, 2014, Colt Defense, CMC, and Colt Canada Corporation entered into the Term Loan Agreement.  The total principal amount outstanding under the Term Loan Agreement is $72,900,000.  Obligations under the Term Loan Agreement are guaranteed by all subsidiaries of Colt Defense that are not also borrowers and are secured by

---

[5] Although the stated maturity date of the Senior Loan and Term Loan is August 15, 2018, the credit agreements governing these facilities provided for automatic acceleration of all amounts outstanding thereunder if there is more than $25 million of Senior Notes outstanding within 90 days of the stated maturity of the Senior Notes.

a first lien on intellectual property and a second lien on all other assets of the borrowers and guarantors.[6]

43.    Proceeds from the Term Loan Agreement were used to repay all amounts outstanding under the Company's prior term loan agreement discussed above and provided additional liquidity that allowed the Company to make the $10.9 million interest payment due on November 17, 2014 to the Senior Noteholders.  The Term Loan Agreement also contained less restrictive financial covenants and amortization provisions than the credit agreement governing the term loan it refinanced.

*(c)    Senior Loan Facility*

44.    On February 9, 2015, Colt Defense, CMC, and Colt Canada Corporation entered into the Senior Loan Credit Agreement.  The total amount principal outstanding under the Senior Loan Credit Agreement is $35,000,000.  Obligations under the Senior Loan Agreement are guaranteed by all subsidiaries of Colt Defense that are not also borrowers and secured by a second lien on intellectual property and a first lien on all other assets of the borrowers and guarantors.[7]

45.    Proceeds from the Senior Loan Credit Facility were used to repay all amounts outstanding under the Company's prior ABL credit agreement and fees related to the refinancing of such agreement, for cash collateral for certain letters of credit, and for additional liquidity and for general working capital purposes.

*(d)    Unsecured Debt*

---

[6] $2,000,000 of the outstanding principal balance of the Term Loan, which was added pursuant to the RSA, is secured only by the assets of Company's foreign subsidiaries.

[7] $2,000,000 of the outstanding principal balance of the Senior Loan, which was added pursuant to the RSA, is secured only by the assets of the Company's foreign subsidiaries.

46.     The Senior Notes, which were issued by Colt Defense and Colt Finance Corp. and guaranteed by all other subsidiaries of Colt Defense, represent the overwhelming majority of the Debtors' unsecured debt.  On May 18, 2015, the Company announced that it had entered into a 30-day permitted grace period with respect to the $10.9 million interest payment due on May 15, 2015 on account of the Senior Notes.

### (e)     Equity Interests

47.     Affiliates of Sciens Management LLC own approximately 87% of the equity interests in Colt Holding Company LLC ("**Parent**"). The Colt Defense Profit Sharing Plan owns 1% of the equity interests of Parent. Finally, certain individual investors and other entities own the remaining 11% of the equity interests of Parent.

### F.     Corporate Governance

48.     Corporate governance of the Debtors is conducted primarily through Colt Defense's eight member Governing Board.  Presently, only two of the eight members of the Governing Board are affiliated with Sciens.  *Daniel J. Standen*, the chairman of the Governing Board, has been a partner of Sciens Capital Management since 2000.  Similarly, *John P. Rigas*, Chairman and Chief Executive Officer of Sciens Capital Management, has been a manager of the Governing Board since 2003.  The Governing Board's six unaffiliated managers include (i) **Dennis Veilleux**, the Company's Chief Executive Officer, (ii) **General George W. Casey Jr**, whose 41 year career in the U.S. army included service as the Chief of Staff of the United States Army from April 2007 to April 2011 and service as the Commander, Multinational Force — Iraq from July 2004 to February 2007, (iii) **Field Marshall the Lord Guthrie of Craigiebank**, whose 40 year military career included service as Chief of the Defense Staff, Chief of the General Staff, and the Principal Military Advisor to two U.K. prime ministers and three U.K.

Secretaries of State for Defense, (iv) **Michel Holmes** and **Phillip Wexler**[8], who are current managers appointed by the United Automobile, Aerospace, and Agricultural Implement Workers of America, and (v) **Alan B. Miller**, a co-founder of the Business and Restructuring Practice of Weil, Gotshal & Manges LLP who joined the Governing Board in November 2014.

49.    Additionally, a restructuring committee of the Governing Board (the "**Restructuring Committee**") was created in November 2014 to evaluate all restructuring alternatives for the Company's secured and unsecured debt and present recommendations to the Governing Board on an ongoing basis.  The Restructuring Committee consists of Daniel Standen, General George W. Casey, and Alan Miller.  The launch of the Offer to Exchange and Disclosure Statement on April 14, 2015, launch of the June 1 Amendment, and execution of the RSA were all unanimously approved by the Governing Board, including the Governing Board's unaffiliated members.  As noted above, in view of the Sponsor's participation as a bidder in the 363 sale process, the Governing Board appointed the Independent Committee so as to ensure the fairness and integrity of the sale process. The members of the Independent Committee are General George W. Casey, Field Marshall the Lord Guthrie of Craigiebank, and Alan Miller.

### G.    The Debtors' Production Facilities

50.    The Debtors operate from facilities located in West Hartford, Connecticut (the "**West Hartford Facility**") and Kitchener, Ontario, Canada.  The West Hartford Facility, where the vast majority of the Debtors' production takes place, is owned by the Landlord, a related party.  Prior to 2005, the West Hartford Facility was owned by an unrelated third party who threatened to terminate the facility lease and sell the facility to a real estate developer.  In response, the Landlord was formed and purchased the West Hartford Facility.  This transaction

---

[8] Mr. Holmes and Mr. Wexler collectively have one vote on matters voted on by the Governing Board.

ensured the facility would be owned by a Colt affiliate that could offer the Company a long term lease on favorable terms and keep operations in West Hartford.  Sciens Capital Management, which formed the Landlord, extended the opportunity to participate in its capitalization to all existing members of Colt Defense and Colt Defense Holding LLC.

51.    It is my understanding, based upon representations made by counsel to the Landlord, that the Landlord is managed by affiliate of the Sponsor, which indirectly owns or controls approximately 30% of the Landlord's membership interests; eleven of the other thirteen entities that hold membership interests in the Landlord, and who collectively hold more than 50% of all of the membership units in the Landlord, hold no or negligible (each less than 1% and an aggregate of less than 2.5%) interests in Colt.  Additionally, it is also my understanding that the managing members of the Landlord have agreed to delegate final, binding authority to make decisions respecting dispositions of the West Hartford Facility, including any extension of the West Hartford Facility Lease, to the single largest member of the Landlord that has no interests in Colt or Sciens.

52.    The West Hartford Facility Lease expires on October 25, 2015.  As a result, the Debtors have attempted to negotiate an extension of the West Hartford Facility Lease while pursuing a consensual restructuring of the Senior Notes.  These efforts resulted in the Landlord signing the RSA executed on May 31, 2015.  Pursuant to the RSA, the Landlord had consented to an extension of the West Hartford Facility Lease for up to five years from the existing expiration date, subject to several customary conditions and provided the Debtors are able to restructure their existing debt on the terms acceptable to the Landlord.  However, the Landlord has presently not consented to an extension of the West Hartford Facility Lease under any other circumstances.  Pursuant to the Sale Motion, interested bidders will be provided access

with all documents related to the West Hartford Facility Lease and the contact information for counsel to the Landlord.  It is my understanding that while the Landlord reserves all rights with respect to an extension of the West Hartford Facility Lease, it is prepared to consider any potential tenant and potentially negotiate a lease with any qualified bidder in the 363 sale process.

53.    Continuity of the West Hartford Facility for a minimum period of three years is critical to the ongoing viability of the Debtors.  Any plan to move manufacturing operations out of the West Hartford Facility would necessarily have to address the complexities concerning environmental and collective bargaining issues, in addition to the normal business risks associated with any relocation of complex manufacturing operations.  I believe a relocation of the Debtors' manufacturing operations out of the West Harford Facility would take a minimum of two to three years and could require tens of millions of dollars of incremental capital investment.

## II.    EVENTS LEADING TO COMMENCEMENT OF THE CASES AND THE DEBTORS' GOALS IN THESE CASES

### A.    Liquidity Issues

54.    The Debtors' current liquidity issues are the result of business trends impacting our recent historical, current and forecasted revenues and cash flows.  These trends include a decline in modern sporting rifle sales from 2013 peak levels as well as declines in aggregate handgun demand, and delays in anticipated timing of U.S. Government sales, which includes foreign military sales through the U.S. Government and certain international sales. These trends are expected to continue to put pressure on our liquidity for the foreseeable future.

55.    Management's plan to mitigate the business risk associated with our increased liquidity challenges include: (i) seeking revenue growth financials across all sales

channels, (ii) executing initiatives designed to optimize our performance and reduce costs, (iii) managing inventory levels for positive cash flow by focusing the production schedule on our backlog of firm commitments, and (iv) working closely with U.S. Government regulators to obtain timely approval of international sales.  Additionally, while liquidity was improved by the discussed management initiatives and entry into the Term Loan and Senior Loan discussed above, it is clear the Company cannot continue to pay approximately $22 million in annual interest payments on the Senior Notes on a go forward basis and continue to operate as a going concern.  As a result, a restructuring of the Senior Notes became one of my top priorities upon being retained as CRO.

56.     The Debtors' pursuit of a consensual restructuring of the Senior Notes was motivated by a number of goals, which included reducing total debt to levels that the Company could reasonably expect to service based on its financial projections, maximizing the return to the Senior Noteholders, and ensuring continuity of operations and existing business relationships.  It was also critical to me that the Company emerge from a restructuring of its Senior Notes as a fully private company with no public reporting requirements.  Presently, the Company is a voluntary filer of public information pursuant to a condition in the indenture governing the Senior Notes.  This public reporting requirement is extremely challenging for a Company of its size and forces the Company to divert significant financial and staffing resources away from other operational initiatives.

**B.     Launch of the Offer to Exchange and Disclosure Statement**

57.     As noted above, the initial launch of the Offer to Exchange and Disclosure Statement occurred on April 14, 2014.  Under this document, the Debtors offered to exchange new secured notes for the existing Senior Notes on substantially similar terms either through an out-of-court exchange offer or through a prepackaged chapter 11 plan of reorganization.  The

exchange rate was set above then current market trading prices for the Senior Notes and was dictated heavily by the financial projections attached to the Offer to Exchange and Disclosure Statement.  The initial deadline for tendering Senior Notes into the exchange offer and voting on the Initial Prepackaged Plan was set at May 11, 2015.  On this day, the Company learned that although only approximately $12.7 million or 5.1%, of the outstanding principal amount of Senior Notes had validly tendered into the exchange offer and voted in favor of the Initial Prepackaged Plan, the Initial Prepackaged Plan was approved by 77% in number of the Senior Noteholders that voted and overwhelmingly supported by voting retail holders.

C.    **Negotiations with the Senior Noteholders**

58.    Following launch of the Offer to Exchange and Disclosure Statement, the Debtors commenced negotiations with the Steering Committee representing approximately 37% of the Senior Notes.  The Company entered into non-disclosure agreements with Institutional Holders serving on the Steering Committee, provided hundreds of documents in response to due diligence request lists, hosted members of the Steering Committee and their advisors on multiple visits to the West Hartford Facility, and extended considerable time and effort reviewing due diligence memoranda prepared by the Steering Committee Advisors.  Additionally, the Company agreed to pay one month of professional fees for the Steering Committee Advsiros, attempted to answer all questions posed by such advisors on the Debtors' operations and the Offer to Exchange and Disclosure Statement, and solicited thoughts from the Steering Committee Advisors on how to best achieve a consensual restructuring transaction.

59.    During these negotiations, the Steering Committee submitted a proposal (the "Institutional Holder Proposal") to the Company on May 7, 2015 that provided that the Senior Noteholders would receive $125,000,000 in new secured notes and 40% of the equity in the reorganized Company in exchange, among other obligations, for their agreement to vote in

favor of a plan of reorganization that contained such terms.  The remaining 60% of the equity would be given to the Senior Noteholders participating in the proposed debtor-in-possession and exit financings.  If a Senior Noteholder was unable to or chose not to participate in debtor-in-possession and/or exit financing, the benefits of the 60% equity grant would pass to the small group of Institutional Holders backstopping the financings.  The total amount of the proposed financings was $55 million, with $10 million subject to future conditions.  Of the total amount, $33 million would be used to refinance the existing Senior Loan Facility, and the remaining balance would be used to fund the costs of a chapter 11 proceeding and provide additional liquidity.  Additionally, each of the Senior Noteholders would receive its pro rata share of 40% of the equity of the reorganized Company only if it elected not to receive a cash distribution of equal value upon voting on the chapter 11 plan.

60.    After receipt of the Institutional Holder Proposal, I discussed its terms with the Company's advisors, the Restructuring Committee, and the Governing Board.  My primary concerns with the Institutional Holder Proposal related to the amount of leverage remaining on the Company, the potential disruption to the Debtor's principal customer and supplier relationships around the world, and the fact that no certainty could be provided by the Steering Committee regarding an extension of the West Hartford Facility Lease (or ability to relocate to a different location).  Additionally, the Institutional Holder Proposal required individual Senior Noteholders to fund incremental loans to the Company to achieve equal treatment for each holder of the Senior Notes and could result in the Company emerging from chapter 11 as a public company (if a sufficient number of the Senior Noteholders elected to receive their pro rata share of 40% of the equity in the reorganized Company), thus obligating the Company to comply with public reporting requirements, which would be burdensome and

costly given the size of the Debtors' operations.  Accordingly, the Company began work on a counterproposal to the Institutional Holder Proposal that addressed these issues and increased the consideration offered to the Senior Noteholders from what was originally proposed in the Offer to Exchange and Disclosure Statement.  These efforts resulted in launch of the June 1 Amendment referenced above.

        **D.**      **June 1 Amendment**

        61.    The June 1 Amendment to the Offer to Exchange and Disclosure Statement increased the principal amount of new secured notes offered to the Senior Noteholders to $112,500,000 from approximately $78,281,250.00.  While launch of the June 1 Amendment was unanimously approved by the Governing Board, several members of the Governing Board unaffiliated with the Sponsor indicated that $112,500,000 in new secured notes represented the maximum amount of bond debt they felt the Company could service under a feasible chapter 11 plan given the Company's then-current and projected financial condition.  Additionally, the June 1 Amendment reflected the terms of the restructuring term sheet attached to the RSA and gave clarity to the terms on which the Secured Lenders would provide the debtor-in-possession financing necessary to finance a chapter 11 proceeding and the exit loans necessary to repay amounts outstanding under the proposed DIP facilities and the existing Term Loan and Senior Loan.  Critically, and as stated above, the Company obtained the commitment of the Landlord to extend the West Hartford Facility Lease upon consummation of a restructuring consistent with the June 1 Amendment and would emerge from such a restructuring without the burden of public filings.

        62.    Also as stated above, the Amended Prepackaged Plan voting deadline expired on June 12, 2015.  Based on the votes received to date by Kurtzman Carson Consultants LLC, in their capacity as solicitation agent, it appears the Amended Prepackaged Plan is not

confirmable, thereby necessitating the Company's desire to resort to an accelerated 363 sale process in order to preserve the value of its business as a going concern.

## III.    SUMMARY OF THE FIRST DAY PLEADINGS[9]

63.    Concurrently with the filing of these chapter 11 cases, the Debtors have filed the following First Day Pleadings:

a) Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("**Joint Administration Motion**");

b) Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors Instead of Submitting a Separate Mailing Matrix for Each Debtor ("**Consolidated Creditor List Motion**");

c) Debtors' Application for Entry of an Order Authorizing Employment and Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date ("**Claims Agent Application**");

d) Debtors' Motion for Entry of an Order Authorizing Colt Holding Company LLC to Act as Foreign Representative on Behalf of the Debtors' Estates ("**Foreign Representative Motion**");

e) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing The Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief ("**Taxes Motion**");

f) Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities; and (III) Establishing Procedures for Resolving Objections to the Debtors' Proposed Form of Adequate Assurance ("**Utilities Motion**");

g) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Renew Their Prepetition Insurance Policies and Pay All Obligations in Respect Thereof and (II) Granting Related Relief ("**Insurance Motion**");

h) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits, and

---

[9] Any capitalized term in this Part III not expressly defined in this Declaration has the meaning used in the relevant First Day Pleading and, to the extent any inconsistencies exist between this Part III and the First Day Pleadings, the terms of the First Day Pleadings shall govern.

(B) Maintain and Continue Such Benefits and Other Employee-Related Programs, and (C) Pay Prepetition Claims of Independent Contractors and (II) Granting Related Relief ("**Wages and Benefits Motion**");

i)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors and (II) Granting Related Relief ("**Critical Vendors Motion**");

j)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of the Debtors' Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements; (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief ("**Cash Management Motion**"); and

k)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral of Pre-Petition Secured Parties; and (II) Granting Adequate Protection to the Pre-Petition Secured Parties ("**DIP Motion**")

64.    I have reviewed each of the First Day Pleadings and I believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings. In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtors' efforts to maintain their businesses as a going concern, and otherwise conduct these cases efficiently, permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

65.    Several of the First Day Pleadings request authority to pay prepetition claims. I am told by the Debtors' advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their

estates. Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein.

### A.    Joint Administration Motion

66.    The Debtors seek entry of an order directing joint administration of their chapter 11 cases for procedural purposes only. The ten Debtors in these chapter 11 cases include Colt Holding Company LLC, its wholly owned subsidiaries, Colt Security LLC and CDH II Holdco Inc., and seven subsidiaries directly and indirectly owned by CDH II Holdco Inc.

67.    Given the integrated nature of the Debtors' operations, I believe that joint administration of these chapter 11 cases would provide significant administrative convenience without harming the substantive rights of any parties in interest. Many of the motions, hearings, and orders in these cases will affect each Debtor, and joint administration would eliminate the need for duplicate pleadings and orders in each of the respective dockets. This, in turn, would save the Court, the Debtors, and any parties in interest substantial time and expense when preparing and filing such documents. Furthermore, joint administration would protect any parties in interest by ensuring that they will be apprised of the various motions filed with the Court with respect to each Debtor.

68.    Because the Debtors seek only administrative, not substantive, consolidation of the estates, I do not believe joint administration would adversely affect the Debtors' respective constituencies. The relief requested in the Joint Administration Motion will not only preserve individual creditors' rights, but also provide those creditors the benefit of cost reductions associated with joint administration.

### B.    Consolidated Creditor List Motion

69.    The Debtors seek entry of an order authorizing the filing of a consolidated list of creditors instead of submitting a separate mailing matrix for each Debtor.

-30-

70.     I believe that permitting the Debtors to maintain a single consolidated list of creditors, instead of filing a separate creditor matrix for each Debtor, is warranted here. Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings. I do not believe that the relief requested in the Consolidated Creditor List Motion will prejudice or otherwise materially impact any parties in interest.

C.      **Claims Agent Application**

71.     The Debtors seek entry of an order authorizing the employment and retention of Kurtzman Carson Consultants LLC ("**KCC**") as the Claims and Noticing Agent, effective *nunc pro tunc* to the Petition Date. I understand that the Debtors and their advisors obtained and reviewed engagement proposals from three court-approved claims and noticing agents to ensure selection through a competitive process. Following that review, and in consideration of the number of anticipated notice parties, the nature of the Debtors' business, and KCC's competitive and reasonable rates given their quality of services and expertise, the Debtors selected KCC to act as the Debtors' Claims and Noticing Agent. I believe that the retention of KCC as Claims and Noticing Agent is necessary and in the best interest of the estates. Indeed, KCC will relieve the Debtors of the burdens associated with claims and noticing services, allowing them to devote their full attention and resources to maximize value for their stakeholders and facilitate the orderly administration of these chapter 11 cases.

72.     I have also reviewed KCC's engagement letter and the description of the services that KCC has agreed to render and the compensation and other terms of the engagement as provided in the Claims Agent Application. Based on that review, I believe that the Debtors' estates, creditors, parties in interest, and this Court will benefit as a result of KCC's experience and cost-effective methods.

73.     I further believe that no parties in interest will be prejudiced by the granting of the *nunc pro tunc* employment because KCC will provide valuable services to the Debtors' estates in the interim period.

### D.     Foreign Representative Motion

74.     The Debtors seek entry of an order authorizing Parent to act as the foreign representative on behalf of the Debtors' estates in any judicial or other proceeding in Canada (the "**Foreign Representative**").

75.     As part of their ongoing business operations, the Debtors have material assets in Canada that are critical to the successful restructuring of the Debtors, including the Debtors' facility in Kitchener, Ontario, which I understand is utilized for manufacturing, engineering, and research and development. One of the Debtors, Colt Canada Corporation, is incorporated under the laws of Nova Scotia as an unlimited company. Therefore, I believe that it is necessary to ensure that these chapter 11 cases and certain of the orders of the Court issued herein are recognized and respected in Canada. As such, shortly following the Petition Date, the Debtors intend to seek recognition of their chapter 11 cases in Canada.

76.     It is in the best interests of the Debtors, their estates and creditors, and any parties in interest that Parent be appointed as the Foreign Representative of the Debtors' estates. Because the Debtors have significant assets in Canada, it is critical that certain of this Court's orders also be recognized in Canada. As a Debtor in these chapter 11 cases and the ultimate parent to each of the Debtors, I believe that Parent is well-positioned to represent the Debtors in any Canadian proceedings and to serve as a conscientious Foreign Representative to ensure that these proceedings are coordinated and recognized in Canada.

E.      **Taxes Motion**

77.    The Debtors seek entry of interim and final orders authorizing payment in full, and in cash, of all prepetition income, sales and use, excise, property, and stamp taxes, business entity fees, regulatory fees, and licensing fees, and all other similar obligations, including any related penalties and interest (collectively, the "**Prepetition Taxes**") that accrued prior to the Petition Date and that will become payable during these chapter 11 cases.

78.    The Debtors incur various tax liabilities and fees and in the past have generally paid such liabilities to the relevant federal, provincial, state, and local authorities (the "**Taxing Authorities**") as they have become due in the ordinary course of business. Based on discussions with the Debtors' finance personnel, I understand that the Debtors estimate that approximately $2,043,500 and $139,000 (CAD) in Prepetition Taxes are currently outstanding or will become due and payable following the Petition Date, $2,300 and $92,000 (CAD) of which the Debtors are seeking authority to pay during the first 21 days of these cases. The Debtors request authority to pay these Prepetition Taxes.

79.    *Sales and Use Taxes*. During the ordinary course of business, the Debtors collect and remit certain taxes related to the sale, use, and consumption of goods and services arising from the sale, use, and purchase of products, inventory, supplies, or other goods in the Debtors' businesses. Specifically, the Debtors collect and remit sales and consumption taxes to the Taxing Authorities in connection with the operation of their businesses and distribution of products. The Debtors also incur use taxes when they purchase materials and services from a vendor that is not registered to collect sales taxes for the state where the property is delivered or the services are provided. In this circumstance, the vendors are not obligated to charge or remit sales taxes. As purchasers, however, the Debtors must self-assess and pay the use taxes, when applicable, to the appropriate Taxing Authority. I understand that the Debtors estimate that as of

the Petition Date, approximately $2,300 and $84,000 (CAD) in sales and use taxes has accrued and remain unpaid for the prepetition period.

80.    *Real and Personal Property Taxes*. Where the Debtors have operations and real and personal property, the Debtors are subject to property tax levied by state and local governments. The Debtors typically pay property taxes for the prior year or quarter depending on how the relevant tax is assessed. I understand that the Debtors estimate that as of the Petition Date, approximately $147,000 in real and personal property taxes has accrued and remain payable for the prepetition period.

81.    *Federal, Provincial, and State Income Taxes*. The Debtors incur federal, provincial, and state income tax liabilities. These corporate income taxes are assessed on each Debtor entity's income and either withheld and remitted monthly or paid annually to the applicable Taxing Authority depending on the jurisdiction. I understand that the Debtors estimate that as of the Petition Date, approximately $50,000 (CAD) in corporate income tax installment payments have accrued and remain payable for the prepetition period.

82.    *General Business License, Reporting, and Regulatory Taxes and Fees*. Many state and local Taxing Authorities require the payment of business license, reporting, and regulatory taxes and fees, for the Debtors to remain in good standing for purposes of conducting business within the applicable jurisdiction. I understand that the Debtors estimate that as of the Petition Date, approximately $24,500 in general business, reporting, license, and regulatory taxes and fees have accrued and remain payable for the prepetition period.

83.    *Federal Firearm License, Excise Taxes, and NFA Special Stamp Tax*. The Bureau of Alcohol, Tobacco, Firearms and Explosives requires the Debtors and their employees to obtain licenses and pay excise taxes and an annual special stamp tax to manufacture and sell

firearms in connection with the Debtors' businesses. I understand that the Debtors estimate that as of the Petition Date, approximately $1,869,000 and $5,000 (CAD) in license fees, excise taxes, and stamp taxes have accrued and remain payable for the prepetition period.

84.     I believe that the Debtors' ability to pay Prepetition Taxes is critical to their continued and uninterrupted operations and would ultimately preserve the resources of the Debtors' estates and going-concern values. It is my understanding from various members of the Debtors' tax and legal departments that the Debtors' failure to pay the Prepetition Taxes could materially and adversely impact the Debtors' business operations in several ways. Among other things, I understand that failure to timely pay the Prepetition Taxes would require the Debtors to spend time and money to resolve whether (i) the obligations are priority, secured, or unsecured; (ii) the obligations are proratable or fully prepetition or post-petition; and (iii) penalties, interest, attorneys' fees, and costs can continue to accrue on a post-petition basis, and if so, whether the penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured.

85.     In addition, I understand that many federal, provincial, state, and local statutes also impose personal liability on officers and directors of companies for certain Prepetition Taxes such entities owe. To the extent that the relevant Prepetition Taxes remain unpaid by the Debtors, the Debtors' directors, officers, and executives may be subject to lawsuits or criminal prosecution during the pendency of these chapter 11 cases. Any such lawsuit or criminal prosecution (and the ensuing potential liability) would, in my opinion, distract the Debtors and their officers, directors, and executives from devoting their full attention to the Debtors' businesses and the orderly administration of these chapter 11 cases. Accordingly, I believe that the relief requested in the Taxes Motion is necessary to avoid immediate and

irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

###    F.    Utilities Motion

86.    The Debtors seek entry of interim and final orders (i) prohibiting Utility Companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors solely on the basis of the commencement of these chapter 11 cases, a debt owed by the Debtors for services rendered prior to the Petition Date, or any perceived inadequacy of the Debtors' proposed adequate assurance of payment to Utility Companies for post-petition services; (ii) approving the Debtors' proposed adequate assurance of payment to Utility Companies for post-petition services (the "**Proposed Adequate Assurance**"); and (iii) approving procedures for resolving objections to the Debtors' Proposed Adequate Assurance.

87.    In the ordinary course of business, the Debtors incur utility expenses for electricity, gas, water, telephone and internet services, including mobile and satellite communications services, and other similar services (collectively, the "**Utility Services**") from a number of Utility Companies. I understand that, on average, the Debtors pay (i) approximately $157,000 per month for Utility Services at the West Hartford, Connecticut facility and (ii) approximately $28,000 (CAD) per month for Utility Services at the Kitchener, Ontario, Canada facility, calculated as a historical average for the twelve-month period ending April 30, 2015.

88.    I anticipate that the Debtors will have sufficient cash on hand to timely pay in full, and in cash, all undisputed post-petition obligations owed to Utility Companies during these chapter 11 cases. Nevertheless, I have reviewed the Proposed Adequate Assurance procedures and believe that those procedures provide the Utility Companies with adequate

assurance of payment, and I do not believe that other or further assurance of payment to Utility Companies for post-petition Utility Services is necessary. However, I understand that the Debtors have also proposed procedures to resolve requests for additional or alternative assurance of payment in an orderly and fair manner.

89.     Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of these cases. Indeed, any interruption in Utility Services, even for a brief period, would disrupt the Debtors' ability to continue operations. Given the Debtors' need to receive uninterrupted Utility Services, the relief requested fairly balances Utility Companies' rights and the Debtors' rights under the Bankruptcy Code. I do not believe that the Utility Companies will be prejudiced by either the Proposed Adequate Assurance or the requirement to provide the Debtors with uninterrupted service.

### G.     Insurance Motion

90.     The Debtors seek entry of interim and final orders authorizing the Debtors to (i) maintain, supplement, amend, extend, renew, or replace their Insurance Policies and (ii) pay any obligations, whether arising before or after the Petition Date, under the Insurance Policies, including premiums, deductibles, self-insured retentions amounts, broker fees, and administrative fees (collectively, the "**Insurance Obligations**").

91.     The Debtors maintain approximately 15 insurance policies through a variety of insurance carriers that provide coverage for, among other things, general liability, umbrella liability, automobile liability, pollution liability, workers' compensation and employer's liability, and directors and officers liability (the "**Insurance Policies**"). In 2014, the Debtors' annual premiums due under the Insurance Policies totaled approximately $4.4 million, which the Debtors either prepaid in full or paid in quarterly installments, depending on the policy. I understand that as of the Petition Date, the Debtors estimate that the Prepetition

Insurance Obligations total approximately $205,000, all of which will become due and owing prior to the entry of a final order.

92.     The nonpayment of any Insurance Obligations could result in insurance carriers terminating their existing policies, declining to renew their insurance policies, or refusing to enter into new insurance agreements with the Debtors in the future.  I believe that any such lapse in coverage would leave the Debtors exposed to significant and potentially crippling liability, and it is therefore essential that the Debtors maintain their Insurance Policies and honor their Prepetition Insurance Obligations.  Accordingly, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to operate their businesses throughout these cases.

### H.     Wages and Benefits Motion

93.     The Debtors seek entry of interim and final orders authorizing the Debtors, and in the exercise of their business judgment, as deemed necessary to continue to operate and preserve value, to (i) pay all prepetition wages, salaries, and compensation and related administrative and incidental costs (all as described below and collectively, the "**Employee Compensation Obligations**") and prepetition employee benefits (all as described below and collectively, the "**Employee Benefit Obligations**"); (ii) pay all employment, unemployment, Social Security, Canada Pension Plan, employment insurance (Canada), and federal, state, provincial, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "**Payroll Taxes**"), and make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions, garnishments, and voluntary deductions (all as described below, and collectively with the Payroll Taxes, the "**Payroll Deduction Obligations**" and collectively with the Employee Compensation

Obligations and Employee Benefit Obligations, the "**Prepetition Employee Obligations**"); (iii) honor and continue the Debtors' prepetition programs, policies, and practices as described in this motion with respect to the Prepetition Employee Obligations in the ordinary course of business; and (iv) pay all prepetition claims of the Debtors' independent contractors (all as described below and collectively, the "**Prepetition Independent Contractor Obligations**").

94.     As of the Petition Date, I understand that the Debtors estimate that the Prepetition Employee Obligations total approximately $1,437,000 and $226,000 (CAD) and the Prepetition Independent Contractor Obligations total approximately $110,000 and $20,000 (CAD), all of which will become due and owing prior to entry of the Final Order.

95.     As of the Petition Date, the Debtors employ approximately 729 employees across North America, of whom 715 are full-time employees, 12 are part-time employees, and two are temporary employees. Of the Debtors' full-time employees located in the United States, approximately (i) 132 employees are salaried (the "**U.S. Full-Time Salaried Employees**"), of whom eight hold the position of senior vice president or higher (the "**U.S. Executives**"); (ii) 36 employees are non-union employees paid on an hourly basis (the "**U.S. Full-Time Hourly Employees**" and together with the U.S. Full-Time Salaried Employees, the "**U.S. Full-Time Non-Union Employees**"); and (iii) 462 employees are paid on an hourly basis and are represented by United Automobile, Aerospace, and Agricultural Implement Workers of America — UAW on behalf of its Amalgamated Local No. 376 (the "**Union**" and the represented employees, the "**Union Employees**" and together with the U.S. Full-Time Non-Union Employees, the "**U.S. Full-Time Employees**") under a collective bargaining agreement dated April 1, 2014 (the "**CBA**"). Of the Debtors' full-time employees located in Canada, approximately (i) 42 employees are salaried (the "**Canadian Salaried Employees**"), of whom

one holds a position of senior vice president or higher (the "**Canadian Executive**") and (ii) 43 employees are paid on an hourly basis (the "**Canadian Hourly Employees**" and together with the Canadian Salaried Employees, the "**Canadian Full-Time Employees**" and the Canadian Full-Time Employees together with the U.S. Full-Time Employees, the "**Full-Time Employees**").

96.     Of the Debtors' 10 part-time employees located in the United States, approximately four are non-union employees paid on an hourly basis and six are non-union employees paid on a per diem basis (collectively, the "**U.S. Part-Time Employees**" and together with the U.S. Full-Time Employees, the "**U.S. Employees**"). The Debtors also employ approximately (i) two part-time employees in Canada who are paid on an hourly basis (the "**Canadian Part-Time Employees**") and (ii) two temporary employees in Canada, one of whom is paid on an hourly basis and another of whom is salaried (the "**Temporary Canadian Employees**" and together with the Canadian Full-Time Employees and the Canadian Part-Time Employees, the "**Canadian Employees**" and the Canadian Employees together with the U.S. Employees, the "**Employees**").

97.     I believe that to remain competitive in a highly specialized industry, it is essential that the Debtors maintain a highly skilled workforce. To prevent constant—and harmful—turnover, I believe that the Debtors must offer competitive wages and benefits to their Employees.

98.     _Wage and Salary Obligations_. Before the Petition Date and in the ordinary course of business, the Debtors typically paid Employee Compensation Obligations to their Employees in accordance with four payroll cycles. The Debtors pay their U.S. Employees on a weekly basis one-week in arrears: (i) on the Thursday of each week to Union Employees for

hours captured from the Monday through Sunday of the prior week and (ii) on the Friday of each week to U.S. Full Time Non-Union Employees and U.S. Part-Time Employees for hours captured from the Monday through Sunday of the prior week. The Debtors pay their Canadian Employees on alternating Thursdays. Canadian Salaried Employees (including any salaried Temporary Canadian Employees) are paid on a bi-weekly current basis and Canadian Hourly Employees (including any hourly Temporary Canadian Employees) and Canadian Part-Time Employees are paid on a bi-weekly basis two-weeks in arrears. I understand that the Debtors estimate that their accrued but unpaid gross payroll as of the Petition Date is approximately $500,000 and $140,000 (CAD).

99. *Payroll Processing Services*. The Debtors rely on the use of two centralized payroll processing systems to transmit payment of their Employee Compensation Obligations to Employees: (i) Automatic Data Processing, Inc. ("**ADP**") handles the Debtors' Employee Compensation Obligations with respect to U.S. Employees and (ii) OuiPay Payroll Services Inc. ("**OuiPay**") handles the Debtors' Employee Compensation Obligations with respect to Canadian Employees. I understand that the Debtors estimate that as of the Petition Date they owe ADP approximately $3,000 and OuiPay approximately $300 (CAD), each in accrued but unpaid fees related to such services.

100. *Payroll Taxes.* The Debtors withhold funds from Employees' wages and salaries and also make certain Payroll Tax payments from their own funds on account of Payroll Taxes. I understand that, as of the Petition Date, the Debtors estimate that they have approximately $265,000 and $22,900 (CAD) in accrued Payroll Taxes outstanding.

101. *Garnishments*. In the ordinary course of processing payroll checks for their Employees, the Debtors may be required by law, in certain circumstances, to withhold from

certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered obligations (collectively, the "**Garnishments**"). When required, the Debtors withhold Garnishments from certain Employees' paychecks and remit the same to the appropriate governmental authorities on a monthly basis. I understand that as of the Petition Date, all Garnishments have been remitted to the appropriate governmental authorities.

102.    *Bonuses and Incentive Programs.* Before the Petition Date, the Debtors offered several bonuses and incentive programs to their eligible employees, including, without limitation, a high performance plan and signing bonus to their U.S. Full-Time Non-Union Employees, a long term incentive plan to their U.S. Executives, and a Canadian bonus plan to certain Canadian Employees. I understand that the Debtors are not seeking authorization to pay any amounts under these programs, but that they expressly reserve their rights to seek such relief in the future.

103.    *Leave Policies.* The Debtors offer certain eligible Employees other forms of compensation, including vacation and sick days, holidays, civic duties leave, and bereavement days. I believe that these forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified Employees to operate their businesses. I understand that the Debtors estimate that as of the Petition Date, the total accrued but unpaid obligations related to vacation days is approximately $1,530,000 and $230,000 (CAD). I also understand that pursuant to the vacation policies, including under the CBA, the Debtors estimate that as of the Petition Date, the total accrued but unpaid obligations on account of (i) vacation allotment is approximately $15,350 for U.S. Full-Time Non-Union Employees and approximately $64,000 for Union Employees and (ii) perfect attendance for Union Employees is $66,500. Failure to

provide these benefits could, in my opinion, harm Employee morale and encourage the premature departure of Employees.

104.     *Holidays*. The Debtors offer between seven and 11 holiday days and to U.S. Full-Time Employees and Canadian Employees per calendar year.

105.     *Civic Duties*. Certain Employees who are obligated to perform certain civic duties, including jury duty, are granted leave to fulfill these obligations.

106.     *Bereavement*. With some exceptions, certain Employees are entitled to take up to three paid bereavement days per year in the event of an immediate family member's death.

107.     *Severance*. Before the Petition Date, the Debtors offered severance pay to eligible employees in accordance with certain guidelines. I understand that the Debtors are not seeking authorization to pay any outstanding severance obligations related to the prepetition period, but that they expressly reserve their rights to seek such relief in the future.

108.     *Expense Reimbursements*. Certain Employees incur expenses in the course of performing their jobs, including travel and meal expenses and telecommuting costs (the "**Business Related Expenses**"). To receive a reimbursement for Business Related Expenses, Employees must submit an expense report detailing their claim and seek reimbursement directly from the Debtors. In addition, the Debtors have arrangements with certain Employees to use American Express cards ("**AmEx Cards**") to charge Business Related Expenses. To receive a reimbursement for Business Related Expenses charged to an AmEx Card, Employees must seek reimbursement directly from the Debtors.

109.     The Debtors pay a monthly average of approximately $118,200 and $24,500 (CAD) for Business Related Expenses, inclusive of administrative fees. The Debtors

cannot estimate the amount of Business Related Expenses outstanding as of the Petition Date because the time for submission for required reports has not come due as of the Petition Date. But based on historic estimates from similar periods, I understand that the Debtors do not expect the amount to exceed $20,000 and $10,000 (CAD).

110.    *Automobile Allowance*. The Debtors offer their Canadian Executive a $500 monthly automobile allowance as a component of their salary. I understand that as of the Petition Date, the Debtors estimate that they have approximately $250 (CAD) in unpaid obligations relating to the Automobile Allowance outstanding.

111.    *Health and Welfare Benefits*. The Debtors offer their eligible Employees various standard employee benefits, which include: medical coverage, dental insurance, vision coverage, COBRA coverage, flexible spending accounts, healthcare spending accounts, and other benefit programs provided to Employees in the ordinary course of business (collectively, the "**Health and Welfare Benefits**").

112.    *Medical Plans*. The Debtors offer medical benefits, including prescription drug coverage, to U.S. Full-Time Employees and their dependents through a self-insured "preferred provider organization" ("**PPO**") plan (the "**Medical Plan**") administered by Anthem Blue Cross/Blue Shield ("**Anthem**"). As of the Petition Date, the Medical Plan has approximately 554 participating Employees.

113.    The cost of the Medical Plan is borne primarily by the Debtors, however, participating employees also contribute to the plan through payroll deductions that are used to fund claim payments made by Anthem. Actual daily payments remitted to Anthem are based on the claims that were approved the prior day and, since the Medical Plan is self-insured, these payments vary from day to day. The Debtors' average daily claims payment under the Medical

Plan is approximately $60,000. The Debtors' last claims payment to Anthem on behalf of the Medical Plan was on or around June 12, 2015. The Debtors' average monthly payment to Anthem for administrative fees in connection with the Medical Plan is $90,000. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Medical Plan is approximately $150,000, inclusive of administrative fees, all of which will become due and owing prior to entry of the Final Order.

114.    *U.S. Non-Union Dental Plan*. The Debtors offer dental coverage to U.S. Full-Time Non-Union Employees and their dependents through a self-insured PPO dental plan (the "**Non-Union Dental Plan**") administered by Delta Dental Plan of New Jersey, Inc. ("**Delta**"). As of the Petition Date, the Non-Union Dental Plan has approximately 150 participating Employees.

115.    The cost of the Non-Union Dental Plan is borne primarily by the Debtors, however, participating employees also contribute to the plan through payroll deductions that are used to fund claim payments made by Delta. Actual weekly payments remitted to Delta are based on the claims that were approved the prior week and, since the Non-Union Dental Plan is self-insured, these payments vary from week to week. The Debtors' average weekly claims payment under the Non-Union Dental Plan is approximately $2,200. The Debtors' last claims payment to Delta on behalf of the Non-Union Dental Plan was on or around June 8, 2015. The Debtors' average monthly payment to Delta for administrative fees in connection with the Non-Union Dental Plan is approximately $710. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Non-Union Dental Plan is approximately $2,710, inclusive of administrative fees, all of which will become due and owing prior to entry of the Final Order.

116.    *U.S. Union Dental Plan*. The Debtors offer dental coverage to Union Employees and their dependents through a fully-insured dental plan (the "**Union Dental Plan**") administered by the Union. As of the Petition Date, the Union Dental Plan has approximately 462 participating Employees. Under the Union Dental Plan, the Debtors make a monthly premium payment of $54 per Union Employee to the Union for administration and claims under the Union Dental Plan and, for each pay period, the Debtors withhold from participating Employees' wages amounts related to the Employees' contributions toward the premiums. The Debtors' average monthly premium payment under the Union Dental Plan is approximately $25,000. The Debtors' last paid their premium payment to the Union on behalf of the Union Dental Plan on or around June 4, 2015. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Union Dental Plan is approximately $25,000, all of which will become due and owing prior to entry of the Final Order.

117.    *U.S. Vision Plan*. The Debtors offer vision coverage to U.S. Full-Time Employees and their dependents through a fully insured vision care plan (the "**Vision Plan**") administered by Anthem. As of the Petition Date, the Vision Plan has 165 participants. The average monthly cost of premiums for the Vision Plan is $1,708, the entirety of which is paid by participating employees. I understand that, as of the Petition Date, the Debtors do not believe they hold any amounts that have been collected from Employees but remain unpaid to Anthem on account of the Vision Plan.

118.    *COBRA Program*. The Debtors also offer eligible U.S. Employees the option to retain COBRA medical and dental coverage generally for up to 18 or 36 months after termination through a program administered by Anthem for medical and vision coverage and by

the Debtors for dental coverage. I understand that the Debtors do not pay any additional administrative or other professional fees to Anthem on account of the COBRA program.

119.    *U.S. Life and Disability Insurance*.

(a)    Life and Accidental Death and Dismemberment Insurance

120.    The Debtors provide U.S. Full-Time Employees with basic life and accidental death and dismemberment insurance in the event of serious illness, injury, or death (the "**Basic Life/AD&D Plan**") through Unum Life Insurance Company of America ("**Unum**"). Unum also provides U.S. Full-Time Employees with the option to purchase supplemental voluntary life insurance and accidental death insurance for themselves and their dependents (the "**Supplemental Life Insurance Plan**").

121.    Under the Basic Life/AD&D Plan, U.S. Full-Time Employees are eligible to receive $30,000 of fully-subsidized life and accidental death and dismemberment insurance from the Debtors, subject to a reduction in coverage at certain ages.  The Basic Life/AD&D Plan is fully-insured by the Debtors at no cost to the participating employee. The Debtors pay an average monthly premium of approximately $9,800 under the Basic Life/AD&D Plan, inclusive of administrative fees. The Debtors last paid their premiums on account of the Basic Life/AD&D Plan on or around May 28, 2015. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Basic Life/AD&D Plan is approximately $10,200, all of which will become due and owing prior to entry of the Final Order.

122.    In addition to the Basic Life/AD&D Plan, U.S. Full-Time Employees have the option to participate in the Supplemental Life Insurance Plan. To the extent an employee elects to participate in the Supplemental Life Insurance Plan, the Debtors deduct the premiums

from the employee's wages on a weekly basis, and then remit the same to Unum. As of the Petition Date, the Debtors do not believe they hold any amounts that have been collected from employees but remain unpaid to Unum on account of the Supplemental Life Insurance Plan.

(b)    Short-Term and Long-Term Disability Insurance

123.    The Debtors offer U.S. Full-Time Employees short-term disability and long-term disability coverage through Unum (collectively, the "**Disability Coverage**") in the event that a participating employee is unable to work for an extended period due to illness or injury. The Disability Coverage is fully-insured by the Debtors at no cost to the participating employee. The Debtors pay an average monthly premium of approximately $19,300 for the Disability Coverage, inclusive of administrative fees. The Debtors last paid their premiums on account of the Disability Coverage on or around May 28, 2015. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Disability Coverage is approximately $20,100, all of which will become due and owing prior to entry of the Final Order.

124.    *Other Benefit Programs*. The Debtors offer several other customary benefits to their U.S. Full-Time Non-Union Employees and which are funded by employee contributions, including, but not limited to: (i) critical illness and accident insurance, whole life insurance, and group accident insurance, each administered by Unum; (ii) group legal coverage administered by MetLife; and (iii) flexible spending accounts administered by Discovery Benefits, Inc. (collectively, the "**Other U.S. Benefit Programs**"). The Debtors' monthly fees for administration of these benefits is approximately $200. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the administration

of the Other U.S. Benefit Programs is approximately $200, all of which will become due and owing prior to the entry of the Final Order.

125.    *Canadian Extended Health Insurance Plan*. The Debtors offer eligible Canadian Employees and retirees extended health insurance (the "**Extended Health Insurance Plan**") through Equitable Life Insurance Company of Canada ("**Equitable Life of Canada**"). The cost of the Extended Health Insurance Plan is borne primarily by the Debtors. The Debtors' average monthly claims payment under the Extended Health Insurance Plan is approximately $15,000 (CAD), inclusive of administrative fees. The Debtors' last claims payment on account of the Extended Health Insurance Plan was on or around May 26, 2015. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Extended Health Insurance Plan is approximately $5,500 (CAD), all of which will become due and owing prior to entry of the Final Order.

126.    *Canadian Dental Plan*. The Debtors offer eligible Canadian Employees and retirees a dental plan administered by Equitable Life of Canada (the "**Canadian Dental Plan**"). The cost of the Canadian Dental Plan is borne primarily by the Debtors. The Debtors' average monthly claims payment under the Canadian Dental Plan is approximately $7,000 (CAD), inclusive of administrative fees. The Debtors' last claims payment on account of the Canadian Dental Plan was on or around May 26, 2015. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Canadian Dental Plan is approximately $2,500 (CAD), all of which will become due and owing prior to entry of the Final Order.

127.    *Canadian Life Insurance and Disability Plans*. The Debtors provide, or offer the option to purchase, life insurance and disability coverage under a Canadian Basic

Life/AD&D Plan, an Optional Life Insurance Plan, a Dependent Life Insurance Plan, an Optional Dependent Life Insurance Plan, a Short-Term Disability Insurance Plan, and a Long-Term Disability Insurance Plan (each as defined below, and collectively, the "**Canadian Life Insurance and Disability Plans**"). The Debtors last paid their premiums on account of the Canadian Life Insurance and Disability Plans on or around June 10, 2015. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Canadian Life Insurance and Disability Plans is approximately $16,500 (CAD), all of which will become due and owing prior to entry of the Final Order.

128.    The Debtors rely on Equitable Life of Canada to administer the Extended Health Insurance Plan, the Canadian Dental Plan, and the Canadian Life Insurance and Disability Plans. Equitable Life of Canada is paid approximately $6,000 (CAD) per month in connection with providing these services for the Debtors. The Debtors also maintain a trust account balance of $34,000 (CAD) to make claims payments to Equitable Life of Canada. I understand that the Debtors estimate that as of the Petition Date they owe Equitable Life of Canada approximately $6,000 (CAD) in administrative fees, all of which will become due and owing prior to entry of the Final Order.

129.    *Canadian Basic Life/AD&D Plan*. The Debtors provide certain Canadian Employees with basic life and additional insurance coverage in the event of serious illness, injury, or death (the "**Canadian Basic Life/AD&D Plan**") through Equitable Life of Canada. The Debtors pay Equitable Life of Canada monthly premiums averaging approximately $4,250 (CAD) on account of the Canadian Basic Life/AD&D Plan, inclusive of administrative fees. Equitable Life of Canada also provides Canadian Employees with the option to purchase supplementary voluntary life insurance and accidental death and dismemberment insurance for

themselves and their dependents (the "**Optional Life Insurance Plan**"). To the extent an employee elects to participate in the Optional Life Insurance Plan, the Debtors deduct the premiums from the employee's wages and then remit the same to Equitable Life of Canada.

130.    *Dependent Life Insurance Plan and Optional Dependent Life Insurance Plan*. The Debtors provide dependents of their eligible Canadian Employees with basic life and additional insurance coverage in the event of death (the "**Dependent Life Insurance Plan**") through Equitable Life of Canada. The Debtors pay Equitable Life of Canada monthly premiums averaging approximately $300 (CAD) on account of the Dependent Life Insurance Plan, inclusive of administrative fees. Equitable Life of Canada also provides eligible Canadian Employees with the option to purchase accidental death and dismemberment insurance for their dependents (the "**Optional Dependent Life Insurance Plan**"). To the extent a Canadian Employee elects to participate in the Optional Dependent Life Insurance Plan, the Debtors deduct the premiums from the Canadian Employee's wages and then remit the same to Equitable Life of Canada.

131.    *Short-Term Disability Insurance Plan*. The Debtors also offer short-term disability insurance to Canadian Hourly Employees (the "**Short-Term Disability Insurance Plan**") through Equitable Life of Canada. For the Short-Term Disability Insurance Plan, the Debtors pay Equitable Life of Canada monthly premiums averaging approximately $2,100 (CAD), inclusive of fees for administration.

132.    *Long-Term Disability Insurance Plan*.  The Debtors also offer long-term disability insurance to certain Canadian Employees who are totally or partially disabled (the "**Long-Term Disability Insurance Plan**") through Equitable Life of Canada.  Participation in the Long-Term Disability Insurance Plan is mandatory and the cost is borne entirely by the

Canadian Employee. The Debtors deduct the premiums on account of the Long-Term Disability Insurance Plan from the Canadian Employee's wages and then remit the same to Equitable Life of Canada. The average monthly amount deducted from participating Canadian Employee's wages on account of the Long-Term Disability Insurance Plan is approximately $4,200 (CAD).

133.    *Salary Continuation Program*. The Debtors also offer a self-insured income continuance program (the "**Salary Continuation Program**") to Canadian Salaried Employees, which confers benefits equal to the employee's full salary for the first six weeks of disability, plus 75% of the employee's salary for up to 26 weeks. The Salary Continuation Program is fully-insured by the Debtors at no cost to the participating employee. The Debtors' average monthly payment under the Salary Continuation Program is approximately $3,475 (CAD). I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Salary Continuation Program is approximately $3,475 (CAD), all of which will become due and owing prior to entry of the Final Order.

134.    *Canadian Statutory Payments*.  The Debtors are also mandated by the Canadian government to make certain statutory payments on account of employment insurance, the Canada Pension Plan (as defined below), and the workers compensation programs with the Workplace Safety and Insurance Board of Ontario (the "**Statutory Payments**"). On average, the Debtors' annual Statutory Payments is approximately $500,000 (CAD). I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Statutory Payments is approximately $15,300 (CAD), all of which will become due and owing prior to entry of the Final Order.

135.    Included in the Statutory Payments, are the Debtors' obligations in connection with a government managed, mandatory pension plan (the "**Canada Pension Plan**").

All Canadian Employees, including Temporary Canadian Employees, are eligible from date of hire to participate in the Canada Pension Plan. As of the Petition Date, the Debtors do not believe they hold any amounts that have been collected from Employees but remain unpaid on account of the Canada Pension Plan.

136.    *401(k) Plan*. The Debtors sponsor a retirement investment plan and withhold from the wages of participating employees contributions toward the Colt Retirement Savings Plan (the "**401(k) Plan**"). As of the Petition Date, 433 Employees participate in the 401(k) Plan (the "**Participating Employees**"). On average, the Debtors withhold approximately $171,000 per month from Participating Employees' paychecks for the 401(k) Plan and loans against the 401(k) Plan, which is then forwarded to the administrator for the 401(k) Plan, USI Consulting Group ("**USI**"). The Debtors do not pay any custodial, administrative, or other professional fees for maintenance of the 401(k) Plan, as USI withdraws its fees directly from Participating Employees' contributions. I understand that the Debtors do not believe that they hold any amounts that have been withheld from Participating Employees' paychecks on account of the 401(k) Plan and have not been forwarded to USI.

137.    On average, the Debtors withhold approximately $171,000 per month from Participating Employees' paychecks for the 401(k) Plan and loans against the 401(k) Plan, which is then forwarded to the administrator and consultant for the 401(k) Plan, USI Consulting Group ("**USI**"). The Debtors' last payment to USI on behalf of the 401(k) Plan was in February 2015. The Debtors' average monthly payment to USI for administrative fees in connection with the 401(k) Plan is approximately $2,000. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations on account of the administrative and

consulting fees related to the 401(k) Plan is approximately $12,000, all of which will become due and owing prior to entry of the Final Order.

138.    Full-Time Non-Union Employees who participate in the 401(k) Plan are eligible to receive from the Debtors a 50% matching contribution up to 6% of the employee's eligible compensation per pay period. Union Employees who participate in the 401(k) Plan are eligible to receive from the Debtors a 100% matching contribution up to 3% of the employee's eligible compensation per pay period. On average, the Debtors' monthly matching contributions under the 401(k) Plan is approximately $171,000. I understand that the Debtors estimate that as of the Petition Date they have approximately $39,000 in matching contributions outstanding, all of which will become due and owing prior to entry of the Final Order.

139.    *Colt Retirement Defined Benefit Plan.*  The Debtors maintain a qualified non-contributory defined benefit plan administered by USI (the "**Colt Retirement Defined Benefit Plan**").[10] The majority of U.S. Full-Time Employees are eligible to participate in the Colt Retirement Defined Benefit Plan. The Colt Retirement Defined Benefit Plan has been closed to new participants for several years. Accordingly, employees may no longer join the plan or accrue additional benefits. As of the most recent funding valuation date of January 1, 2014, approximately 471 current and former employees are participants in the Colt Retirement Defined Benefit Plan. As of the last annual valuation date, the Colt Retirement Defined Benefit Plan was fully funded. I understand that the Debtors are not seeking authorization to make any post-petition contribution payments with respect to the Colt Retirement Defined Benefit Plan or the

---

[10] On December 31, 2014, Colt's Manufacturing Company LLC Bargaining Unit Employees' Pension Plan, which covered most of the U.S. Full-Time Hourly Employees (the "**Colt's Manufacturing Pension Plan**") was merged with the Colt Retirement Defined Benefit Plan.

Colt's Manufacturing Pension Plan, but that the Debtors expressly reserve their rights to seek such relief in the future.

140.    *Colt Defense Profit Sharing Plan*. Colt Defense LLC maintains a profit sharing plan for Union Employees who had 1,000 hours of service during each plan year and were at least 21 years old prior to September 1, 1997, the date the ability to participate in the Colt Holding Corp. Profit Sharing Plan was frozen (the "**Colt Defense Profit Sharing Plan**"). Employees may no longer join the Colt Defense Profit Sharing Plan or accrue additional benefits. The Debtors' contributions to the Colt Defense Profit Sharing Plan are discretionary and are determined by the board of directors of Colt Defense LLC. The Debtors made no contributions to the Colt Defense Profit Sharing Plan during the years ended December 31, 2014, 2013, and 2012. As of December 31, 2013, the plan had $1,082,555 in net assets available for benefits. The Debtors pay for all administrative expenses of the Colt Defense Profit Sharing Plan. In 2014, the Debtors paid approximately $12,000 in administrative and legal fees on account of the Colt Defense Profit Sharing Plan. I understand that the Debtors estimate that as of the Petition Date they have approximately $10,000, inclusive of administrative fees, outstanding in connection with the Colt Defense Profit Sharing Plan, all of which will become due and owing prior to entry of the Final Order.

141.    *New Colt Holding Corp. Profit Sharing Plan*.  New Colt Holding Corp. maintains a profit sharing plan for Union Employees who had 1,000 hours of service during each plan year and were at least 21 years old prior to September 1, 1997, the date the plan was frozen (the "**New Colt Profit Sharing Plan**"). Employees may no longer join the New Colt Profit Sharing Plan or accrue additional benefits. The Debtors' contributions to the New Colt Profit Sharing Plan are discretionary and are determined by the board of directors of New Colt Holding

Corp. The Debtors made no contributions to the New Colt Profit Sharing Plan during the years ended December 31, 2014, 2013, and 2012. As of December 31, 2013, the plan had $109,063 in net assets available for benefits. The Debtors pay for all administrative expenses of the New Colt Profit Sharing Plan. In 2014, the Debtors paid approximately $5,000 in administrative and legal fees on account of the New Colt Profit Sharing Plan. I understand that the Debtors estimate that as of the Petition Date they have approximately $2,500 in administrative fees outstanding in connection with the New Colt Profit Sharing Plan, all of which will become due and owing prior to entry of the Final Order.

142. _Retiree Health Program_. The Debtors maintain two retiree health care plans for retired Union Employees and their spouses (the "**Retiree Health Programs**"), which provide for supplemental Medicare hospitalization and medical services and are administered by Anthem. As of the Petition Date, the Debtors estimate that there are approximately 351 participants in the Retiree Health Program. The Retiree Health Program for which such employee is eligible is based on whether the employee retired before or after April 1, 2007. For those employees who retired on or before April 1, 2007, the Retiree Health Program is a self-insured plan with $500 per year in prescription drug reimbursement coverage. The Debtors' average monthly claims payment under the Retiree Health Program for those employees who retired before April 1, 2007 is approximately $179,000. For those employees who retired after April 1, 2007, the Retiree Health Program is a fully-insured/funded plan provided by the Debtors and does not include prescription drug reimbursement coverage. The Debtors' average monthly premium payment under the Retiree Health Program for those employees who retired after April 1, 2007 is approximately $32,000. The Debtors pay an average of approximately $20,000 per month to Anthem to administer the Retiree Health Programs. I understand that the Debtors

estimate that as of the Petition Date the total accrued but unpaid obligations related to the Retiree Health Programs is approximately $231,000, inclusive of administrative fees, all of which will become due and owing prior to entry of the Final Order.

143.   *Retiree Life Insurance Plan*.  The Debtors provide a $3,000 death benefit (the "**Retiree Life Insurance Plan**") for retired employees who did not receive a disability payout from life insurance while they were an active employee. The Retiree Life Insurance Plan is only available for those employees who have retired after April 1, 2007. The Debtors pay approximately $410 per month on account of the Retiree Life Insurance Plan. I understand that the Debtors estimate that as of the Petition Date the total accrued but unpaid obligations related to the Retiree Life Insurance Plan is approximately $400, all of which will become due and owing prior to entry of the Final Order.

144.   *Registered Pension Plan*.  The Debtors provide eligible Canadian Employees with a mandatory defined contribution pension plan (the "**Registered Pension Plan**"). Under the Registered Pension Plan, eligible employees may contribute a minimum of 1% and a maximum of up to 2.5% of their base earnings, which is matched by the Debtors. Eligible employees may join the Registered Pension Plan on January 1st or July 1st; provided that the employee has completed service of 700 hours prior to enrollment. The Registered Pension Plan has assets of approximately $2.6 million (CAD) and costs the Debtors approximately $140,000 (CAD) annually to fund. On average, the Debtors' monthly matching contributions on account of the Registered Pension Plan is approximately $12,500 (CAD). I understand that the Debtors estimate that as of the Petition Date they have approximately $2,800 (CAD) in matching contributions outstanding, all of which will become due and owing prior to entry of the Final Order.

145. _Registered Retirement Savings Plan_.  The Debtors provide a voluntary group registered retirement savings plan (the "**Registered Retirement Savings Plan**"), under which the eligible Canadian Employees can choose to make pre-tax contributions. The Registered Retirement Savings Plan, which is fully funded by its participating members, has assets of approximately $1.1 million (CAD) and costs the Debtors $1,200 (CAD) annually to fund, the entirety of which is covered by participating employees through payroll deduction.  As of the Petition Date, the total accrued but unpaid obligations related to the Registered Retirement Savings Plan is approximately $1,200 (CAD), all of which will become due and owing during prior to entry of the Final Order.

146. _Tax-Free Savings Plan_.  The Debtors provide a voluntary tax free savings account plan (the "**Tax-Free Savings Plan**"), under which the eligible Canadian Employees can choose to make post-tax contributions.  The Tax-Free Savings Plan, which is fully funded by its participating members through payroll deductions, has assets of approximately $1,200 (CAD). The average monthly cost of premiums for the Tax-Free Savings Plan is approximately $30 (CAD), the entirety of which is paid by participating employees.

147. _Canada Savings Bond_.  The Debtors provide a voluntary savings bond (the "**Canada Savings Bond**"), under which the eligible Canadian Employees  (excluding Temporary Canadian Employees) may make voluntary contributions that are remitted to the Government of Canada and may make voluntary withdraws from the account.  The purchase of the bonds are facilitated through payroll deductions and the amount of assets are unknown. The contributions to the Canada Savings Bond are not held by the Debtors and it has no impact on the Debtors' account.

148. _Deferred Profit Sharing Plan_. Colt Canada Corporation provides a deferred profit sharing plan for eligible Canadian Employees (the "**Deferred Profit Sharing Plan**"). The Deferred Profit Sharing Plan is performance based and consists of a calculation of adjusted operating income to determine a total distributable sum to qualifying employees. The respective sum is then distributed to employees on the basis of their pro-rata share of base earnings of the qualified base earning total.

149. The Deferred Profit Sharing Plan has assets of approximately $4.6 million (CAD). The Debtors typically make payments in July based on results from the previous year. On average, the Debtors' annual payment on account of the Deferred Profit Sharing Plan is approximately $500,000 (CAD). The Debtors did not make any payments under the Deferred Profit Sharing Plan in 2014 and the Debtors do not believe they will make any payment in 2015.

150. _Independent Contractor Obligations_. To complement their workforce, the Debtors retain (i) approximately 11 independent contractors in the United States (the "**U.S. Independent Contractors**") through Accountemps, Creative Financial Staffing LLC, KForce Inc., SNI Companies, Unitek Technical Services Inc., Whittlesey Hadley, P.C., Linda Colaresi, LLC, and Battlefield Sports Ltd. (collectively, the "**U.S. Agencies**"), and (ii) approximately two independent contractors in Canada (the "**Canadian Independent Contractors**" and together with the U.S. Independent Contractors, the "**Independent Contractors**") through Ranstad Canada ("**Ranstad**") and through direct invoice to one individual (the "**Canadian Individual Independent Contractor**").

151. The U.S. Agencies invoice the Debtors for work completed four weeks in arrears. The Debtors pay the U.S. Agencies approximately $114,400 per month for the services of the U.S. Independent Contractors. Ranstad invoices the Debtors for work completed five

weeks in arrears. The Debtors pay Ranstad approximately $7,500 (CAD) per month and the Canadian Individual Independent Contractor approximately $12,000 (CAD) per month, each for the services of the Canadian Independent Contractors. The Debtors estimate that as of the Petition Date the total accrued and outstanding Prepetition Independent Contactor Obligations are approximately $110,000 and $15,000 (CAD).

152.    Satisfying the Prepetition Independent Contractor Obligations is integral to the Debtors' ability to operate their business in chapter 11. As noted above, the Debtors depend on the Independent Contractors and believe it would be difficult to replace them and virtually impossible to continue operating without them. As with their Employees, the Debtors have spent considerable resources identifying Independent Contractors who understand the Debtors' business practices and policies. The Debtors believe that failing to pay the Independent Contractors, and satisfying the Prepetition Independent Contractor Obligations, would disrupt the Debtors' operations and harm reorganization efforts.

153.    Finally, like the Employees, the Independent Contractors (and the individuals employed by the Independent Contractors) rely on payments received from the Debtors for income. These individuals will likely be exposed to financial difficulties if the Debtors are not permitted to continue honoring the Prepetition Independent Contractor Obligations, an outcome that may impair the Debtors' ability to contract reliable personnel going forward.

154.    I believe that paying Prepetition Employment Obligations will benefit the Debtors' estates and their stakeholders by allowing the Debtors' business operations to continue during these chapter 11 cases. Indeed, I believe that without the requested relief, the Employees may seek alternative opportunities, perhaps with the Debtors' competitors. Such a development

would deplete the Debtors' workforce and hinder the Debtors' ability to continue to operate their businesses. The loss of valuable Employees would be distracting and counterproductive at this critical juncture. Accordingly, I believe that the relief requested in the Wages and Benefits Motion is necessary to avoid irreparable harm to the Debtors and to preserve the value of their estates throughout these chapter 11 cases and, therefore, is in the best interests of the Debtors, their estates, and all of their stakeholders.

## I.    Critical Vendor Motion

155.    The Debtors seek entry of interim and final orders authorizing the Debtors to pay prepetition obligations of certain vendors, suppliers, service providers, and similar entities that provide goods or services critical to the ongoing operation of the Debtors' businesses (the "**Critical Vendors**" whose claims are the "**Critical Vendor Claims**") in the ordinary course in an amount not to exceed $11.3 million, all of which will become due and owing prior to the entry of a final order.

156.    The Debtors operate in a highly specialized industry that requires them to rely heavily on certain Critical Vendors to provide them with specialized and unique parts, materials, and services necessary to manufacture handguns, long guns and related offerings, and firearms-related parts that the Debtors produce to U.S., Canadian, and foreign military forces, global law enforcement and security agencies, consumers, and collectors (collectively, the "**Customers**"). Because the firearms manufactured by the Debtors are safety-critical and must adhere to rigorous production and quality standards, many of the parts and services provided from third party vendors and suppliers are highly specialized and must undergo a lengthy and detailed validation and testing process. As a result, a significant amount of parts and services supplied by the Critical Vendors require substantial lead time to develop and cannot be replaced in a timely or efficient manner. Moreover, I understand that a significant number of the Debtors'

vendors and suppliers are sole source suppliers meaning that these vendors are the only supply source for certain complex parts necessary to the Debtors' production process, and cannot be timely and/or efficiently replaced. The Debtors do business with many of these vendors pursuant to short term, or "spot" purchase orders without a long-term agreement.

157.    The Debtors are particularly dependent on relationships with foreign and domestic military customers. Nearly all of the Debtors' sales to foreign and domestic militaries are made under indefinite delivery, indefinite quantity contracts that are the result of a highly competitive bidding process. The Debtors' ability to compete successfully for U.S., Canadian, and other military and law enforcement contracts depends on the readiness and capacity of their manufacturing facilities, equipment, and personnel to produce quality products consistently. To avoid catastrophic disruptions in the Debtors' ability to produce high-quality products in a timely fashion, it is of the utmost importance that the Debtors' supply chain remain intact. I understand that any such disruption could result in production stoppages for the Debtors and delays in shipments, which could result in irreparable harm to the Debtors' relationships with Customers.

158.    Anticipating this difficult situation, the Debtors took painstaking efforts to ensure their operational stability prior to commencing these chapter 11 cases by identifying a narrow group of vendors and service providers deemed to be Critical Vendors. Specifically, I understand that the Debtors' management, with the assistance of advisors, spent substantial time and effort studying accounts payable and vendor lists for those vendors, suppliers, and service providers most essential to operating their business. In examining their vendor relationships, the Debtors considered whether:

- the vendor is a sole-source or limited-source supplier or service provider;
- the vendor has the ability to exercise remedies against property belonging to the Debtors' customers;

- the vendor has a statutory lien against property of the Debtors for unpaid obligations;
- the vendor provides services that are so vital to, or so commingled with, the Debtors' businesses that even brief disruption would harm the Debtors' operations;
- the Debtors would be able to cost-effectively obtain comparable products or services from alternative sources within a reasonable timeframe;
- the vendor is able or likely to refuse providing essential supplies or services to the Debtors if prepetition balances are not paid; and
- the business relationship between the Debtors and the vendor is governed by a long-term contract.

159.    The Debtors believe that this deliberative process, combined with the proposed terms and conditions of payment of Critical Vendor Claims, which I discuss below, justifies the relief requested in the Critical Vendors Motion. To be clear, the Debtors are not seeking to pay all prepetition claims of the Critical Vendors. Instead, the Debtors seek to pay such undisputed amounts in the ordinary course of the Debtors' businesses and on terms consistent with the Debtors' prepetition practices. If the Debtors are unable to honor these obligations, the Debtors face the real possibility that the Critical Vendors may refuse to continue to deliver goods and services essential to the operation of the Debtors' businesses and critical to maintaining going-concern value.

160.    The Debtors plan to use reasonable efforts where appropriate and practicable to condition payments to Critical Vendors on each Critical Vendor's agreement to (i) accept such payment in satisfaction of all or a part of its Critical Vendor Claim and (ii) continue to provide supplies or services to the Debtors during these chapter 11 cases consistent with those practices and programs (including credit limits, pricing, timing of payments, and availability) in place in the 12 months before the Petition Date ("**Customary Trade Terms**"). To this end, the Debtors may elect to execute Trade Agreements with Critical Vendors evidencing these terms.

161.    I believe that the relief requested in the Critical Vendor Motion is narrowly tailored to prevent any unexpected or inopportune interruption to the Debtors' businesses during these chapter 11 cases and facilitate the Debtors' restructuring efforts. Without the Critical Vendors' services, the Debtors may be forced to halt most, if not all, ongoing business immediately while they search for substitute vendors, if any even exist, and the Debtors could be forced to forgo existing favorable trade terms. Any interruption in the goods or services supplied by the Critical Vendors, however brief, would disrupt the Debtors' operations and cause irreparable harm to the Debtors' estates. As such, I believe that the relief requested in the Critical Vendor Motion is essential in order for the Debtors to maintain their relationships with, and honor their outstanding payment obligations to, the Critical Vendors, and is in the best interests of the Debtors, their estates, and all of their stakeholders.

## J.    Cash Management Motion

162.    The Debtors seek entry of interim and final orders (i) authorizing the Debtors to continue to use their centralized cash management system (the **"Cash Management System"**) and bank accounts; (ii) waiving certain bank account and related requirements of the Office of the U.S. Trustee; (iii) authorizing the Debtors to continue their existing deposit practices under the Cash Management System (subject to certain reasonable changes to the Cash Management System that the Debtors may implement); (iv) extending time to comply with section 345(b) of the Bankruptcy Code; and (v) authorizing Intercompany Transactions consistent with historical practice and granting administrative expense priority to Intercompany Transactions.

163.    The Cash Management System is an integrated, global network of bank accounts that, I believe, is critical to the Debtors' operations during these cases and, in turn, maximizing the value of the Debtors' estates. The Debtors use the Cash Management System to

collect cash from operations and to make cash disbursements (primarily payroll and payments to vendors) to manage their businesses. The Cash Management System also serves a strategic function, facilitating the Debtors' cash monitoring, forecasting, and reporting, and enabling the Debtors to control administration of their bank accounts. The Debtors take care to record all collections, transfers, and disbursements, including Intercompany Transactions, made through the Cash Management System as and when made. I describe the Debtor Bank Accounts, as well as the Intercompany Transactions, below.

**a.**     **The Debtor Bank Accounts**

164.    There are 29 Debtor Bank Accounts, the majority of which are held at Wells Fargo**,** Bank of America, and Royal Bank of Canada. Each Debtor Bank Account is insured by the Federal Deposit Insurance Corporation ("**FDIC**"), the Canadian Deposit Insurance Company ("**CDIC**"), or the Fonds de Garantie des Dépôts et de Résolution ("**FGDR**"), as applicable. I understand that the Debtors are in the process of transitioning their Cash Management System from Bank of America to Wells Fargo. While much of the transition was completed in the first quarter of 2015, several bank accounts remain open at Bank of America for the convenience of certain customers and for various administrative purposes. The Debtors hope to close all of the Bank of America accounts and complete the transition to Wells Fargo by the end of June of 2015.

165.    *The Master Operating Account*. The Debtors' master operating account (the "**Master Operating Account**"), in the name of Colt's Manufacturing Company LLC ("**Colt Manufacturing**"), is a zero-balance account that is the focal point of the Wells Fargo Cash Management System and serves several critical functions, including (i) receiving amounts deposited by customers into the Depository Account (described in greater detail below); (ii) funding the Accounts Payable Account, the Debt Service Accounts, and the Payroll Accounts

-65-

(each as described in greater detail below), which are used to conduct the Debtors' day-to-day business operations; (iii) disbursing amounts in the form of wire transfers to vendors and suppliers; and (iv) disbursing amounts in connection with Intercompany Transactions.

166.    *Deposit Accounts*.  The Debtors' main deposit account (the "**Depository Account**"), in the name of Colt Manufacturing, is a zero balance account maintained at Wells Fargo. The majority of the cash receipts generated from the Debtors' businesses are received largely as checks and ACH transfers and deposited into the Depository Account. Funds in the Depository Account are automatically swept each day into the Master Operating Account through a zero balance mechanism and the Depositary Account balance is reduced to zero. I understand that any funds received into the deposit accounts at Bank of America that remain open are transferred on a weekly basis to the Depository Account.

167.    *The Accounts Payable Account*.  The Debtors' main accounts payable account (the **"Accounts Payable Account"**), in the name of Colt Manufacturing, is a zero balance account maintained at Wells Fargo. The Debtors use the Accounts Payable Account to pay the majority of their domestic non-payroll-related Disbursements (with the exception of payments related to the Debtors' indebtedness), including payments to vendors and suppliers in the form of checks. As checks are presented to the Accounts Payable Account, they are funded from the Master Operating Account.

168.    *Payroll Accounts*: The Debtors maintain a dedicated zero balance payroll account in the name of Colt Manufacturing and a second payroll concentration account in the name of Colt Security LLC at Wells Fargo (collectively, the "**Payroll Accounts**"), each of which is funded by the Master Operating Account. Colt Manufacturing's Payroll Account is used to pay most of the Debtors' employees located in the United States. Colt Security's Payroll Account is

used to fund payroll for the security guards that safeguard and monitor the Debtors' West Hartford, Connecticut facility, as well as for the payment of certain management fees. In connection with each payroll cycle, the Debtors pre-fund payroll accounts at Automatic Data Processing, Inc. ("**ADP**") from the respective Payroll Accounts, and ADP issues payroll on the Debtors' behalf through either a direct deposit or by issuing a payroll check.

169.    *Debt Service Accounts*.  The Debtors maintain two concentration accounts, one in the name of Colt Defense LLC and another in the name of New Colt Holding Corp., from which the Debtors repay outstanding amounts owed under the Senior Loan Agreement, the Term Loan Agreement, and the Senior Notes Indenture (the "**Debt Service Accounts**").

170.    *Other Bank Accounts*.   Colt Defense Technical Services LLC also maintains a bank account at Wells Fargo for tax purposes related to expatriate employees of Colt International Coöperatief U.A. ("**Colt International**"), a Dutch entity, which had a zero balance as of the Petition Date. There are also two bank accounts in the name of Colt International, one at Bank of America and one at Societe Generale, which are used for administrative expenses related to the Debtors' non-U.S. ventures. I understand that the account at Societe Generale is insured by the FGDR, which is the functional equivalent of the FDIC in France. The Debtors' remaining bank accounts at JP Morgan, BMO Harris, and Interaudi Bank, each in the name of Colt Defense, are collateral for the Debtors' various standby letters of credit and performance bonds.

171.    *Colt Canada Bank Accounts*.  In connection with the Debtors' Canadian operations, Colt Canada Corporation ("**Colt Canada**") maintains Canadian dollar ("**CAD**"), Euro, and U.S. dollar ("**USD**") accounts at Wells Fargo and Royal Bank of Canada (collectively, the "**Colt Canada Bank Accounts**").

(a)    <u>Canadian Dollar Bank Accounts</u>.    The majority of funds received and disbursed in Canadian dollars enter and leave the Debtors' Cash Management System through depository and accounts payable accounts at Royal Bank of Canada ("**RBC**"). The majority of CAD-denominated customer deposits are received into a zero-balance depository account at RBC, which automatically sweeps into a zero-balance depository account at Wells Fargo ("**WF Canadian Depository Account**"). I understand that CAD-denominated (and other non-Euro and non-USD denominated) deposits from customers located outside Canada, however, are deposited directly into the WF Canadian Depository Account.[11] Funds in the WF Canadian Depository Account are then swept into an accounts payable account at Wells Fargo and are subsequently transferred to an accounts payable account at RBC, from which CAD-denominated disbursements to vendors and suppliers are made. Payroll-related disbursements for employees of Colt Canada are also made in Canadian dollars from the accounts payable account at RBC. I understand that each of the accounts at RBC is insured by the CDIC, which is the functional equivalent of the FDIC in Canada.

(b)    <u>Euro Bank Accounts</u>.    Funds received in Euros are deposited into a separate zero balance account in the name of Colt Canada at Wells Fargo, which sweeps into an accounts payable account at Wells Fargo.[12] All Euro-denominated

---

[11] I understand that in connection with the transition of the Debtors' Cash Management System from Bank of America to Wells Fargo, some CAD-denominated deposits are still being deposited in Colt Canada's CAD-denominated depository account at Bank of America. These funds are swept into the WF Canadian Depository Account on an as needed basis, with a small amount left behind to cover bank fees drawn against the account.

[12] I understand that in connection with the transition of the Debtors' Cash Management System, some Euro-denominated deposits are still being deposited in Colt Canada's Euro-denominated depository account at Bank of America. These funds are swept into the depository account at Wells Fargo on an as needed basis, with a small amount left behind to cover bank fees drawn against the account.

disbursements on behalf of Colt Canada are made from accounts payable account at Wells Fargo.

(c)    U.S. Dollar Bank Accounts.  Similarly, funds received in U.S. dollars are deposited in a separate zero balance account in the name of Colt Canada at Wells Fargo, which sweeps into an accounts payable account at Wells Fargo. All USD-denominated disbursements on behalf of Colt Canada are made from the accounts payable account at Wells Fargo.[13]

172.    *Bank Fees.* The Debtors allow the deduction of service charges and other fees, costs, and expenses arising in the ordinary course (collectively, the "**Bank Fees**") from certain of the Debtor Bank Accounts (collectively, the "**Bank Fees**"). I understand from my staff that the Debtors estimate that they pay on average monthly Bank Fees of approximately $17,000 and $5,400 (CAD) and that they owe prepetition Bank Fees of approximately $7,000 and $5,000 (CAD).

### b.    Intercompany Transactions

173.    As a result of business transactions and cash flows among the Debtors, at any given time there may be intercompany claims owing by one Debtor to another. Examples of such Intercompany Transactions include payments related to dividends, royalties, short term loans, and other commercial transactions among the Debtors. I understand that the Debtors track all Intercompany Transactions through the Cash Management System and can ascertain, trace, and segregate any Intercompany Transactions. Indeed, during these cases, the Debtors intend to segregate and separately track post-petition Intercompany Transactions.

---

[13] I understand that in connection with the transition of the Debtors' Cash Management System, some USD-denominated deposits are still being deposited in Colt Canada's USD-denominated depository account at Bank of America. These funds are swept into the depository account at Wells Fargo on an as needed basis, with a small amount left behind to cover bank fees drawn against the account.

174.    As discussed earlier, the Cash Management System is an ordinary course and essential business practice. The burden and administrative expense of, among other things, closing the Debtors Bank Accounts, opening new accounts, printing new checks, and revising the Cash Management System, in order to comply with certain UST Requirements would severely hamper the Debtors' ability to serve customers and meet post-petition obligations and jeopardize the Debtors' ability to maximize value for parties in interest. In addition, I believe that it is imperative that the Debtors be able to engage in Intercompany Transactions during these chapter 11 cases. The Intercompany Transactions provide the Debtors access to liquidity that may be necessary to fund ongoing operations. If the Intercompany Transactions were discontinued, the Cash Management System and the operations of the Debtors would be harmed, all to the detriment of the Debtors and their estates. Accordingly, I believe that the relief requested in the Cash Management Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates and is in the best interests of all stakeholders.

### K.    DIP Motion

153.    In the DIP Motion, the Debtors request entry of interim and final orders (each, as applicable, the "**DIP Order**") authorizing them to obtain post-petition secured debtor in possession financing in an aggregate principal amount of up to $20,000,000.00 consisting of (i) a $6,666,666.67 DIP facility (the "**Senior DIP Facility**") and (ii) a $13,333,333.33 DIP facility (the "**Term DIP Facility**", and together with the Senior DIP Facility, the "**DIP Facilities**").  The lenders under the Senior DIP Facility are identical to the lenders under the Senior Loan and the lenders under the Term DIP Facility are identical to the lenders under the Term Loan.  The Debtors also request in the DIP Motion that the Court authorize related relief, including the consensual use of the Prepetition Secured Parties' Cash Collateral.

175.    The DIP Facilities, if approved, will provide working capital critical to funding the Debtors' day-to-day operations. Without access to the DIP Facilities, the Debtors will be forced to immediately cease operations, which would result in immediate and irreparable harm to their business and deplete the going concern value of their business and all assets. Therefore, because the Debtors' available and projected Cash Collateral is insufficient to fund their operations, the credit to be provided under the DIP Facilities is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

176.    Additionally, as detailed in the Declaration of Nikhil Menon in support of the DIP Motion (the "**Menon Declaration**"), the DIP Facilities are the result of extensive arm's length negotiations between the Debtors and the Prepetition Secured Parties related to the Debtors' liquidity issues, financing needs, and goals for these chapter 11 cases.  Additionally, as detailed in the Menon Declaration, the Debtors sufficiently investigated the possibility of obtaining post-petition financing from other third party lenders, who were either unwilling to provide financing, were only willing to do so on a "priming" basis on economic terms no more favorable to the Debtors than the DIP Facilities, or were unwilling to do so on a basis junior to the Term Loan and Secured Loan.

177.    In my opinion, the DIP Facilities represent the Debtors' best alternative for post-petition financing as they provide the Debtors with sufficient and immediate liquidity, without the risk of a priming fight (as the Prepetition Secured Lenders have agreed to prime themselves as DIP Lenders), on terms negotiated at arm's length.  Accordingly, I believe that all relief requested in the DIP Motion is in the best interests of the Debtors and necessary for the Debtors to continue operations during these chapter 11 cases.

178.    In my opinion, the DIP Facilities represent the Debtors' best alternative for post-petition financing as they provide the Debtors with sufficient and immediate liquidity, without the risk of a priming fight, on terms negotiated at arm's length.  Accordingly, I believe that all relief requested in the DIP Motion is in the best interests of the Debtors and necessary for the Debtors to continue operations during these chapter 11 cases.

## **CONCLUSION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing
is true and correct to the best of my knowledge and belief.

Dated: June 14, 2015
        West Hartford, Connecticut

_____
Keith A. Maib
Chief Restructuring Officer
Colt Defense LLC

## Exhibit A

**Organizational Chart**

# COLT ORGANIZATIONAL STRUCTURE AS OF JUNE 14, 2015

