## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                              :    Chapter 11
In re:                                        :
                                              :    Case No. 15-11296 (LSS )
COLT HOLDING COMPANY LLC, et al.,             :    (Jointly Administered)
                                              :
                         Debtors.             :    Hearing Date: June 24, 2015 @ 9:30 a.m. ET
                                              :    Re: Dkt. Nos. 12, 14, 60, 61, 100
------------------------------------------------------------x
```

### REPLY OF SCIENS CAPITAL MANAGEMENT LLC TO THE OBJECTIONS OF THE AD HOC CONSORTIUM OF HOLDERS OF SENIOR NOTES TO THE DEBTORS' DIP MOTION

Sciens Capital Management LLC, for itself and for various affiliated funds in which it and its investors have direct and indirect ownership interests (collectively, "Sciens") in Colt Defense LLC and its affiliates (collectively, "Colt" or the "Debtors"), by and through its undersigned counsel, hereby submits this reply (the "Reply") to the objections,[1] filed by the Ad Hoc Consortium (the "Consortium") of holders of those certain 8.75% Senior Notes issued by Colt (the "Senior Notes"), to the motion[2] filed by the Debtors for authority to enter into a debtor-in-possession financing agreement and related relief (the "DIP Motion"). In support of this Reply, Sciens respectfully states as follows:[3]

---

[1]    See *Objection to the DIP Motion and Response to the Debtors' Allegations Regarding the Ad Hoc Consortium* [Dkt. No. 60] (the "Initial Objection"); *Supplemental Objection of Ad Hoc Consortium of Holders of Senior Notes to Debtors' DIP Motion* [Dkt. No. 100] (the "Supplemental Objection" and, together with the Initial Objection, the "Objections").

[2]    See *Debtors' Motion (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Liens and SuperPriority Administrative Expense Status, and (C) Utilize Cash Collateral of Pre-Petition Secured Parties; (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; (III) Scheduling a Final Hearing; and (III) Granting Related Relief* [Dkt. No. 12] (the "DIP Motion"); see also *Declaration of Nikhil Menon in Support of DIP Motion* [Dkt. No. 14] (the "Menon Declaration").

[3]    Capitalized terms used herein but not otherwise defined have the meanings ascribed thereto in *Keith A. Maib's Declaration in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 17].

## PRELIMINARY STATEMENT

1.      Sciens and Colt have implemented a sales process, governed by independent board members, designed to ensure a price for Colt's assets that meets the entire fairness standard and that will maximize value for all stakeholders.  In order to afford stability to this process, Sciens, a long-time owner of Colt, is prepared to serve as buyer if no one else emerges.  Colt's independent board members decided to pursue this approach because of the ill-considered, pre-petition efforts of the Consortium to burden Colt with more debt than it can handle, and to arrogate value to the Consortium's institutional members to the exclusion of several thousand small, retailer holders of the Senior Notes who collectively hold tens of millions of dollars of these obligations.  An independent sales process, conducted under the watchful eye of this Court, eliminates the potential for further games by the Consortium:  if its members want to own Colt, they need to bid for it.

2.      The Consortium's financial advisor admitted in his deposition that the Consortium's proposed DIP financing is intended to derail this process.  Without a sales process, Colt will be in a free-fall chapter 11.  But Colt cannot survive a free-fall chapter 11.  It derives almost half of its revenue from U.S. and allied governments.  There is a substantial risk that Colt will lose its contracts with these critical customers in a protracted chapter 11, as they cannot rely on a bankrupt company with an uncertain future to provide them with vital military equipment.  This is why the independent committee authorized a sales process with a committed, experienced, back-stop bidder.   This Court should not countenance the enormous risk of value destruction engendered by the Consortium's approach.  It should instead defer to the judgment of Colt's independent committee members regarding the DIP Motion.  As further explained below, that committee has been vested with _exclusive_ authority to determine which financing option is

best for Colt; Sciens and its board designees have <u>no</u> vote on the matter.  The Consortium's

objections therefore are without merit and should be overruled.

## ARGUMENT

**A.      A Fair and Independent Process Has**
**Been Established to Ensure Maximum Value**
**For All of Colt's Stakeholders**

3.      Sciens controls approximately 87% of the equity interests in the Debtors.  It and

its predecessor together have held this controlling interest for over 20 years, having originally

acquired the assets of Colt's business out of bankruptcy in 1994.  During Sciens's lengthy

ownership of Colt, Sciens has provided invaluable capital investments, management consulting

services and management team support and, as a result, has helped Colt continue its long

tradition as one of the premier manufacturers of firearms for the United States and foreign

governments while significantly growing its top-line revenue.  The defense industry is intensely

competitive.  Governments, municipalities, and security agencies have the very highest and most

demanding specifications for firearms.  Colt consistently has met these demands.  Indeed, it

could never have continued in business had it not maintained the trust and confidence of

purchasers with the most uncompromising and rigorous standards.  To meet these standards

requires the expertise and stability afforded by a fully committed equity sponsor.  Anything less

will cause Colt's franchise value to vanish.

4.      Sciens wants to maintain an ownership stake in Colt.  It does so in order to

maximize the value of Colt, via continuity of ownership, expertise, stability and relationships

with vendors and government customers and, indirectly, to maximize the value of its own

investment.  It is for these entirely legitimate reasons that Sciens consistently has sought to

maintain control of Colt, and why it also expressed interest to Colt in serving as a stalking horse

bidder for substantially all its assets pursuant to a sale under section 363 of the Bankruptcy Code. But Sciens cannot and will not do so at all costs, nor at the price of a compromised process. Heightened scrutiny applies here:  for Sciens to successfully acquire Colt's assets, it is imperative that there be a fair process and a fair price.  A fair process and a fair price benefit everyone.  For these reasons, at the suggestion of Sciens's two designees on Colt's eight-member board, independent checks and balances have been established to ensure that an entirely fair process is conducted, and that the value of Colt is maximized for the benefit of all its stakeholders.

5.      First, a three-person committee of Colt's board has been created (the "Independent Committee") and given full, exclusive, and final authority over the section 363 process.[4]  For all practical purposes, the Independent Committee is Colt in connection with any sale, including negotiations with any and all prospective purchasers.  The existence and scope of the Independent Committee's powers were confirmed through the deposition testimony of the Independent Committee's lead director, Mr. Alan Miller, who has over forty years' experience practicing insolvency law and who has served as an independent director of approximately 20 companies.[5]  Moreover, the Independent Committee has been vested with full, exclusive and final authority over Colt's debtor-in-possession financing options, including whether to proceed with the proposal from Colt's existing lenders or the proposal submitted by the Consortium.[6]

---

[4]   See COLT0000032R.

[5]   Miller Dep. at 149 ("Sciens would not have a veto, because they voluntarily have delegated these issues [i.e. issues where there is a potential conflict between the interests of the company and the interests of Sciens] to be dealt with by the independent committee").  The fact that Field Marshal the Lord Guthrie of Craigiebank, one of the members of the Independent Committee, has served as an independent member of other Sciens affiliates does not mean he is not independent, and the Consortium cites no authority to the contrary. See, e.g., Highland Legacy Ltd. v. Singer, C.A. No. 1566-N, 2006 Del. Ch. LEXIS 55, *30-35 (Del. Ch. March 17, 2006) (rejecting conclusory allegations that directors lacked independence because of their service together on other boards); Zimmerman v. Braddock, C.A. No. 18473-NC, 2002 Del. Ch. LEXIS 145, *39-45 (Del. Ch. Dec. 20, 2002) (rejecting conclusory allegations that directors lacked independence because of service on boards of other companies purportedly controlled by insiders).

[6]   See Miller Dep. at 142-44.

6.      Second, Sciens' designees to the managing member of its affiliated landlord, NPA

Hartford LLC ("NPA Hartford"), have also agreed to vest full, exclusive and final authority over

any determination regarding the extension of the lease of Colt's West Harford manufacturing

facility[7] in the largest holder of interests in NPA Hartford with no interests in Colt (the

"Independent NPA Director").  This fact, along with the scope of the Independent Committee's

powers, were made clear to the Ad Hoc Committee via not only the deposition of Mr. Miller, but

also via the production of applicable board minutes and resolutions of Colt and NPA Hartford[8].

These facts were made known to the Consortium before it filed its voluminous submissions on

Friday.  Yet the Consortium's papers make no mention of them.

7.      The upshot is that Sciens and Colt have taken the steps necessary to ensure a fair

process and a fair price with respect to the 363 sale process, the DIP financing process, and the

leasing process.  The Independent Committee represents and protects the interest of Colt; the

Independent NPA Director represents and protects the interests of NPA Hartford, and Sciens and

its designees will act only as a potential acquirer, with no power to make any decisions

respecting the 363 sales, the DIP financing or the lease.  And as Mr. Miller testified at his

deposition, and as he will be prepared to testify at the relevant hearing on these matters, the 363

process proposed by Colt, in consultation with its investment bankers and its senior lenders, is

designed to ensure a fair process that will maximize the value of Colt's business for all

stakeholders.

---

[7]     In 2005, prior landlord Coltec Industries Inc. ("Coltec") – which was not affiliated with Sciens or the Debtors –
gave the Debtors notice that it intended to terminate the Debtors' lease for the West Hartford facility and sell the
property to a third-party real estate developer.  In order to save the property, Sciens and its associates and
affiliates formed and funded NPA Hartford to purchase the property from Coltec.

[8]     See Resolution of the Managing Member of NPA Hartford LLC, effective as of May 1, 2015.

8.      In particular, Sciens will receive <u>no</u> break-up fee if a higher and better offer for Colt's assets is accepted by the Independent Committee.  While the Consortium asserts, without foundation, that the proposed 363 timeline is too short, the fact is that the market has been aware of Colt's refinancing efforts since February, during which time <u>no</u> suitors other than Sciens and members of the Consortium have appeared.  And the hard truth is that, for various liability, political and social reasons, there is a very limited universe of potential acquirers of firearms manufacturers.  The Consortium's submissions concede as much.[9]  In light of this brutal fact, plus the very fragile nature of Colt's business – which survives only by the grace of government, municipal, and security agency trust and confidence – Colt simply will not survive a protracted and uncertain in-court process.[10]

9.      Perhaps most importantly, <u>nothing</u> prevents the Consortium members from bidding on Colts' assets.  If they think they can put together a better offer, and that they collectively can maintain government confidence and hence, Colt's franchise value, then they are free to do so.  They have a proven capacity to act quickly.  Their resources and Colt's survival prospects are far better spent/served by putting their money where their mouths are and making a competing bid rather than running up a litigation tab that Colt can't afford.

**B.      The Consortium's Efforts to Take Control Are**
   **Harmful to Colt and Discriminate Against Small,**
   <u>**Retail Holders of the Senior Notes**</u>

10.      The foregoing is all that should matter for purposes of the hearing on the Debtors' DIP Motion.  <u>Everything</u> else about the Consortium's papers is irrelevant.  Indeed, the <u>only</u> matter for determination on Wednesday concerns Colt's DIP financing.  It is <u>not</u> a hearing on the

---

[9]      <u>See</u> Supplemental Objection at ¶ 53.

[10]     <u>See</u> Miller Dep. at 70-72; 134-37; 169-71.

proposed 363 process, which is set for hearing on July 14, nor should it be allowed to devolve into a sprawling, half-baked, quasi- hearing on exclusivity or for a trustee, or a referendum on Sciens's pre-petition stewardship of Colt.

11.    The Consortium seems to think that the Third Circuit Court of Appeals' decision in In re Abbots Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986), supports its efforts to shoehorn into the DIP hearing all matters related to the sales process solely because Sciens is serving as a stalking horse bidder.  That is not what Abbot Laboratories says, and it is factually distinguishable from this case.  In Abbot Laboratories, the chief executive officer of the debtor testified at a first-day hearing in support of an interim operating agreement with a potential acquirer of the debtor's assets, without disclosing that he had been promised a position with the acquirer if it were the successful bidder.  The facts were later revealed at the sale hearing, but the bankruptcy court approved the sale with no finding of good faith.  On that record, the Third Circuit reversed the sale order and remanded for a determination of whether the buyer acted in good faith.  Accordingly, Abbot Laboratories does not support the Consortium's efforts to turn Wednesday's hearing into a broad-ranging referendum on all things Sciens.

12.    Moreover, the Consortium's incomplete assertions, innuendo and hyperbole are cleverly designed to obfuscate the issues for this Court's consideration and to distort the actual, historical facts.  Critically, the Consortium acts like it is the entire universe of holders of Colt's Senior Notes, when the fact is that there are several thousand small, unsophisticated retail holders who collectively hold tens of millions of dollar of those Senior Notes.  While the Independent Committee only owes fiduciary duties to the Debtors' estates, the Independent Committee nevertheless has sought to ensure that the interests of those retail holders, as well as the institutional holders comprising the Consortium, are respected and that value is maximized

7

notwithstanding the designs of the institutional holders.  Given the great divergence of interests

between the members of the Consortium and retail holders, the Independent Committee is

vigilant and skeptical of the Consortium's overtures.

13.    For example, the Consortium makes much of its pre-petition proposal for a

restructuring of Colt and its related proposal for DIP financing.  Under those proposals, holders

of the Senior Notes would have received 40% of reorganized Colt's equity.[11]  Yet 60% of

reorganized Colt's equity was slated for the institutional holders willing to provide DIP

financing.[12]  While the Consortium complains that the current DIP financing proposal is

outcome-determinative – it isn't, because the Consortium and any other bidder is free to bid – the

Consortium's proposal for institutional holders to receive 60% of reorganized Colt not only was

extortionate pricing for DIP financing, it is also precisely the sort of outcome-determinative and

self-serving DIP arrangements that courts abhor.  See, e.g., In re Mid-State Raceway, Inc., 323

B.R. 40, 59 (Bankr. N.D.N.Y. 2005) (noting that "'while certain favorable terms may be

permitted . . . bankruptcy courts do not allow terms in financing arrangements that convert the

bankruptcy process from one designed to benefit all creditors to one designed for the

unwarranted benefit of the postpetition lender'") (quoting Resolution Trust Co. v. Official

Unsecured Creditors Committee (In re Defender Drug Stores, Inc.), 145 B.R. 312, 317 (9th Cir.

BAP 1992)); In re Ames Dept. Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990) (noting that a

postpetition financing agreement should be rejected if "its purpose is not so much to benefit the

estate as it is to benefit a party-in-interest").  If the Consortium was truly interested in reaching a

consensual restructuring, it would have submitted an alternative proposal after the draconian

---

[11]    See Consortium Exhibit 65, Demonstrative: Summary of Principal Terms of May 7, 2015 Noteholder DIP Proposal.

[12]    See Id.

proposal described above was rejected.  However, this proposal was the only DIP and restructuring terms that the Consortium offered.

14.     Moreover, the Consortium's pre-petition proposal to allow all holders of Senior Notes to participate in the DIP via a "rights offering" is cold comfort to the typical, unsophisticated retail investor who is in no position to invest.  Individual retail investors likely have no idea what DIP financing is, let alone an appetite or ability to actually participate in one. The Consortium's proposal for a DIP financing fee equal to 60% of Colt's equity therefore was designed to ensure that the institutional holders would get all this value for themselves.  It is no wonder that Courts in this District have expressed such skepticism about rights offerings backed by a small group of distressed investors that prejudice retail holders who aren't at the negotiating table.  See In re Washington Mutual, Inc., 442 B.R. 314, 322, 360-61 (Bankr. D. Del. 2011) (requiring modification of chapter 11 plan's discriminatory provisions denying participation in a $100 million rights offering to small-claims holders, while allowing large-claims holders in the same class the right to participate).  The Independent Directors, with fiduciary duties to maximize value for all stakeholders, refused to countenance the Consortium's designs.

15.     Additionally, the Consortium's criticisms of Colt's pre-petition exchange offers, including in particular the proposal for Sciens to retain ownership, completely overlook Sciens's 21-year history in the firearms industry and the concomitant importance of the continuity, stability and expertise it would bring to reorganized Colt, its government relationships, and its franchise value.  The alternative to this ownership structure, advocated by the Consortium, is a reorganized Colt owned largely by distressed and other bondholders, managed by committee. The Consortium never adduced any evidence that such an ownership and management structure would be workable in practice, acceptable to the defense industry, or value-accretive to all

stakeholders – including the retail holders that the Consortium proposed to freeze out with its DIP proposal.

16.    When a board is confronted with a take-over bid, it has a duty to satisfy itself that a change of control will not be inimical to the company's business or enterprise. See, e.g., Gilbert v. The El Paso Co., 575 A.2d 1131 (Del. 1990) (approving target directors' rejection of a bid that, supported by the opinion of the directors' advisors, threatened the corporate enterprise); Unocal Corp. v. Mesa Petrol. Co., 493 A.2d 946, 954 (Del. 1985) (noting that directors have a "fundamental duty and obligation to protect the corporate enterprise . . . from harm reasonably perceived, irrespective of its source").  The Consortium's composition and proposal afforded little comfort in this regard.

17.    Sciens and Colt nonetheless were highly sensitive to the fact that holders of Senior Notes deserved fair treatment.  However, the amount of debt that Colt feasibly could retain on its balance sheet was very limited.  Colt's sales for the year ended 2014 were down 30% from the previous year.[13]  The company had a net loss and negative EBITDA for 2014.[14]  The same trend continued during the first quarter of 2015.  The budget attached to the DIP Motion shows free cash flow for 2015 of negative $16 million.[15]  The liquidation analysis attached to the pre-packaged plan shows that, in a liquidation, proceeds of only $68 million to $85 million would be realized, resulting in full recovery for the senior lenders, but a recovery of only 38%

---

[13]    See Consortium Exhibit 32, Colt Defense LLC and Colt Finance Corp., Fourth Supplement, filed on June 1, 2015, to Offer to Exchange, Consent Solicitation Statement, and Disclosure Statement Soliciting Acceptances of a Prepackaged Plan of Reorganization, filed on April 14, 2015, at p. 4 of 564.

[14]    See id. at p. 4 of 564; id. at p. 5 of 564.

[15]    See DIP Motion, Exhibit C.

and 58% for the term lenders and <u>zero</u> recovery for all other stakeholders, including the Consortium.[16]

18.　　Despite these hard facts, Colt nonetheless proposed that Noteholders receive new notes, secured by Colt's assets, in a face amount equal to 45% of the face amount of the Senior Notes, or $112.5 million.  Colt did so despite the fact that the trading value of the Senior Notes was far less than this amount,[17] and despite Colt's belief that this amount of debt was at the very outer limits of achievability.  The retail holders of the Senior Notes, who hold Senior Notes in a principal amount of approximately $61 million, overwhelmingly agreed with the foregoing approach.  The retail holders' support is evidenced by the fact that approximately 77% of all Noteholders who actually voted accepted the plan.  It is clear that it was the institutional holders, focused only on their own short-term interests, who torpedoed the plan.

19.　　At the end of the day, however, Sciens's, Colt's and the Consortium's different perspectives on Colt's go-forward ownership and the parties' pre-petition proposals simply do not matter.  For the Consortium is free to prove Sciens's views about the value of continuity of ownership wrong, and the Consortium also is free to prove Sciens's and Colt's views of value wrong.  The Consortium is free to do so by <u>making a bid</u>.  If, as the Consortium believes, there is value above the secured debt, then it will make a bid that reflects such value.  If the Consortium believes that a fifteen-headed management committee comprised of distressed investors will be more appealing to the government, then it is free to prove that belief by making a bid.  The

---

[16]　　<u>See</u> Consortium Exhibit 4, Colt Defense LLC and Colt Finance Corp., Offer to Exchange, Consent Solicitation Statement, and Disclosure Statement Soliciting Acceptance of a Prepackaged Plan of Reorganization, filed on April 14, 2015, at Appendix B (Liquidation Analysis).

[17]　　Miller Dep. at 76 ("Well, we frankly thought we had a plan that should have satisfied our bondholders, because we were offering them significantly more in the exchange offer than their debt was being traded for on the market.").

beauty of the 363 process is that it forces interested parties either to bid real value – or take a walk.  That rule applies to <u>everybody</u>:  Sciens as well as the Consortium.

**C.    The Consortium's Other Jibes at Sciens**
**Are False, Misleading And Not Conducive**
**To Value Preservation or Consensus**

20.    The Consortium's numerous other efforts to sling mud at Sciens also are irrelevant and false.  The Consortium asserts that the Independent Committee process is meaningless because Colt can remove directors.  That's true of every independently-owned company.  It is also entirely beside the point.  What matters is that Sciens has caused control of the sales process to be vested in the Independent Committee under the spotlight afforded by the very public forum of a bankruptcy court.  That will <u>not</u> and <u>cannot</u> change, as it would be profoundly inimical to the interests of the estate and Sciens's investment for it to do so.

21.    Equally irrelevant is the Consortium's focus on the limitation in Colt Defense LLC's operating agreement of the fiduciary duties of Sciens and its board.  That is an entirely proper term under Delaware law governing limited liability companies.[18]  Moreover, the Delaware Supreme Court has held that creditors of a Delaware limited liability company have no standing to assert derivative claims for breach of fiduciary duty on behalf of the company – even if it is insolvent.  <u>CML V LLC v. Bax</u>, 2011 Del. LEXIS 480 (Del. Sept. 2, 2011).  Regardless, Mr. Miller testified at his deposition that he and the other members of the Independent Committee nonetheless are acting as fiduciaries for the benefit of <u>all</u> stakeholders under the ultimate authority of this Court.[19]

---

[18]    <u>See</u> 6 <u>Del. C.</u> § 18-1108(c), (e).

[19]    <u>See</u> Miller Dep. at 59-60; 150.

22.     The Consortium trumpets the fact that Colt made $241.3 million in special distributions and redemptions to its equity holders.  That is in fact true:  <u>since 2002</u>, a period of <u>13 years</u>!  Over $210 million of that amount, approximately 87% of the total, was made prior to 2010 and was the culmination of years of hard work and success that led to significant value creation in the business.  What possible relevance do distributions so old have to the matters at hand?  The answer is <u>none</u>.  The far more limited distributions since 2010 – arguably the farthest back anyone could look for fraudulent transfers – were largely comprised of routine tax-related distributions and the purchase of equity from a third party investor.  Management fees to Sciens during this five-year period totaled $3.7 million – an average of $740,000 per year, which is well within the norm for privately managed companies like Colt that generate $200 million of revenue per year.  And missing from the Consortium's schedule of distributions is any mention of the significant financial support provided by Sciens since it took ownership of Colt in 1994, including an additional investment of over $8.5 million in just the last two years.

23.     The Consortium's digression into distributions to Sciens are designed to suggest that Colt is in financial distress because Sciens left the company without the resources necessary to operate.  That clearly is not the case.  The overwhelming majority of the distributions were made eight years ago.  More importantly, as described in depth in the first-day declaration of Mr. Maib, the root cause of Colt's current situation is a rapid and dramatic decline in sales, which the Noteholders seem uninterested in addressing.  As noted above, top line sales decreased 30% from 2013 to 2014.  Lower sales translated into liquidity pressures, resulting in Colt's inability to pay its fixed overhead costs.  Colt, with the assistance of Sciens, refinanced the senior portion of Colt's capital structure toward the end of 2014.  This refinancing allowed Colt to make its November interest payment on the Senior Notes and at the time anticipated that Colt would be in

a position to pay interest in May.  However, the company's 2015 projected growth continued to dampen as suppliers slowed sales to Colt.  In short, Sciens's management fee and other distributions have nothing to do with Colt's financial difficulties.

24.     Lastly, the Consortium's complaint about Sciens and Colt's tax planning are legally irrelevant, the Third Circuit Court of Appeals having recently ruled that the tax aspects of a tax pass-through entity such as a limited liability company are not assets of the entity – even if it is in bankruptcy – but are instead the assets of its owner.  The Majestic Star Casino v. Barden Dev. Inc., 716 F.3d 736 (3d Cir. 2013).  The extent it is relevant, Mr. Miller testified that as part of Colt's overall restructuring, the company implemented a tax reorganization earlier this year that benefitted Colt:[20]  it is easier for an enterprise to raise capital if is treated as a corporation for tax purposes rather than a partnership or other tax pass-through entity.

25.     Despite the foregoing, Sciens is, and remains, ready, willing and able to work with the Consortium, having made a significant proposal to the Consortium and its counsel on Friday evening.  It is, however, difficult to negotiate in confidence with the Consortium.  It filed declarations on Friday from Abraham Han and Vladimir Jelisavcic, of the Consortium's financial advisor, GLC Advisors & Co., LLC, and one of the Consortium's members, Bowery Investment Management LLC, respectively, in which the give-and-take of pre-petition settlement discussions were publicly revealed in excruciating and misleading detail.  This is why we have Federal Rule of Evidence 408.  And Mr. Han's declaration is loaded with opinion testimony, including about the 363 process – despite his having admitted during his deposition that he's not an expert, and is testifying only as a fact witness.[21]

---

[20]     Miller Dep. at 98-100.

[21]     Virtually none of Mr. Han's self-serving, 21-page declaration and related exhibits are relevant or appropriate to this Court's consideration of whether the DIP Motion should be granted.  Hence, at a minimum, the following

26.     Mr. Han also admitted that the Consortium's DIP is designed to derail a 363

process.[22]  This is a reckless approach given the fragility of the business.  With no 363 process,

Colt will be in a free-fall chapter 11.  Presumably the Consortium's next step is a motion to

terminate exclusivity – this is in fact the subtext of its current objection – but a dueling plan

process will create even more exorbitant expense and uncertainty to Colt's detriment.  Indeed, the

Consortium has no plan:  it only has litigation.[23]  It is taking the same approach with respect to

NPA Harford and the lease.  It is all well and good, as the Consortium argues, that Connecticut

law may afford a debtor certain hold-over rights that may be extended through litigation.  But

there is no business stability or certainty for a firearms manufacturer in that approach, let alone a

basis for a feasible plan of reorganization.

## CONCLUSION:  THE CONSORTIUM SHOULD BID

27.     To repeat, none of these sideshows should matter or be given any credence by this

Court.  If the Consortium is serious about owning and operating Colt, it should make a bid.  It

cannot legitimately claim that it doesn't have enough time to formulate one.  The Consortium has

been in existence for seven months and has done extensive diligence.  It has proven that it can

formulate plan and DIP proposals with great alacrity.  But any bid it chooses to make will need

---

portions of the declaration and related exhibits should be stricken and not admitted into evidence:  (i)
paragraphs 6 through 10 regarding Colt's ownership history and the 13 year history of distributions and payment
of management fees; (ii) paragraphs 13 through 19 regarding the pre-petition letter-writing campaign; (iii)
paragraphs 20 through 28 regarding Colts' pre-petition refinancing of its secured indebtedness and more letter-
writing; (iv) paragraphs 31 and 52 which contain opinion testimony about the pre-packaged plan and the 363
process despite Mr. Han's admission during his deposition that he is not testifying as an expert; and (v)
paragraphs 32 through 43, which improperly divulge the contents of settlement discussions.  Paragraphs 8
through 20 and paragraphs 24 through 33 of Mr. Jelisavcic's declarations should be stricken for the same
reasons.

[22]    See Han Dep. at 43.

[23]    The proceeds of the Consortium's proposed DIP financing will, if approved, be used in part to pay the
prepetition litigation-related fees of its counsel, which total approximately $1.75 million. See Han Dep. at 36.

to treat everyone fairly, including the retail holders, whom the Consortium so blatantly tried to freeze out in its exorbitant pre-petition DIP proposal.

28.    In connection with Colt's pre-petition restructuring efforts, Colt, with Sciens's help, was prepared to afford Senior Note holders $112.5 million of consideration if this deal could be done without protracted litigation.  But the Consortium's obstinance has jeopardized, and now likely torpedoed, those efforts since Colt's limited resources must instead be diverted to funding the Consortium's war.  This Court should not countenance the Consortium's conduct. The Consortium should stop this nonsense, and formulate an acquisition bid for the Independent Committee's consideration.

[SIGNATURES ON NEXT PAGE]

16

Dated: Wilmington, Delaware
      June 23, 2015

                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                    */s/ Jason M. Liberi*
                    Anthony W. Clark (I.D. No. 2051)
                    Jason M. Liberi (I.D. No. 4425)
                    One Rodney Square
                    P.O. Box 636
                    Wilmington, Delaware 19899-0636
                    (302) 651-3000 (telephone)
                    (302) 651-3001 (facsimile)

                    - and -

                    Jay M. Goffman, Esq.
                    Mark A. McDermott, Esq.
                    Evan A. Hill, Esq.
                    Skadden, Arps, Slate, Meagher & Flom LLP
                    Four Times Square
                    New York, New York 10036-6522
                    Telephone: (212) 735-3000
                    Fax: (212) 735-2000

                    *Counsel for Sciens Capital Management LLC*