# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:                  :    Chapter 11

COLT HOLDING COMPANY LLC, *et al.*,[1]   :    Case No. 15-11296 (LSS)

          Debtors.       :    Jointly Administered

                                  :    **Re: D.I. 406**

-------------------------------------------------------------x

## DEBTORS' OPPOSITION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER GRANTING IT (A) DERIVATIVE STANDING TO ASSERT, PROSECUTE, AND SETTLE CLAIMS ARISING OUT OF THE DEBTORS' LEASE OF THE WEST HARTFORD FACILITY WITH NPA HARTFORD LLC; AND (B) AUTHORIZATION TO HOLD, ASSERT AND, IF NECESSARY, WAIVE PRIVILEGES ON BEHALF OF THE ESTATES [D.I. 406]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Colt Holding Company LLC (0094); Colt Security LLC (4276); Colt Defense LLC (1950); Colt Finance Corp. (7687); New Colt Holding Corp. (6913); Colt's Manufacturing Company LLC (9139); Colt Defense Technical Services LLC (8809); Colt Canada Corporation (5534); Colt International Coöperatief U.A. (6822); and CDH II Holdco Inc. (1782). The address of the Debtors' corporate headquarters is: 547 New Park Avenue, West Hartford, Connecticut 06110.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 4

*The Debtors' Independent Committee
has taken positions adverse to all major
constituencies in this bankruptcy.* ...................................................................... 4

*The Committee asked for permission to
conduct discovery to determine whether any
claims exist against Sciens or the Landlord.* ..................................................... 5

*Negotiations among the Debtors, the
Bondholders' Consortium, Sciens, and
NPA Hartford have been fruitful.* ....................................................................... 5

*The Committee moves for derivative standing to assert claims,
settle claims, and see privileged and protected material.* ................................. 6

ARGUMENT .......................................................................................................... 7

I.    THE COMMITTEE HAS NOT DEMONSTRATED ANY OF
THE ELEMENTS REQUIRED FOR DERIVATIVE STANDING. ........................... 8

    A.    The Committee has not established that the benefit of pursuing
its proposed claims would outweigh the high cost of litigation or
provide a better outcome than a negotiated solution. ................................ 8

        i.    The Committee's proposed litigation
would be messy, costly, and lengthy. ........................................... 9

        ii.    The Committee has not demonstrated that pursuing its
claims would benefit the estates. ................................................ 10

        iii.    The Committee has not demonstrated that
its claims are likely to succeed. .................................................. 12

    B.    The Committee has not established that
its proposed claims are colorable. ........................................................... 12

    C.    The Debtors did not unjustifiably
refuse to pursue the proposed claims. ..................................................... 13

II.    NO LAW SUPPORTS THE COMMITTEE'S OVERREACHING
REQUEST FOR EXCLUSIVE AUTHORITY TO SETTLE CLAIMS. ..................... 14

III.    NOR DOES ANY LAW SUPPORT THE COMMITTEE'S OVERREACHING
REQUEST TO INVADE THE DEBTORS' PRIVILEGE. ..................................... 17

    A.    The attorney-client privilege and work product immunity
are sacrosanct and should not be cast aside. ........................................... 17

Page

B.  No authority supports the Committee's claim that derivative standing necessarily occasions a privilege waiver. ................................... 18

C.  Even on the Committee's theory of the law, the Debtors' privilege should not be invaded. .......................................... 19

D.  The Committee asks to see all of the Debtors' privileged documents, including those that have not yet been created. ........................................................ 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Adelphia Commc'ns Corp.*,
330 B.R. 364 (Bankr. S.D.N.Y 2005) ........................................................................................8

*In re Adelphia Commc'ns Corp.*,
371 B.R. 660 (S.D.N.Y. 2007) .................................................................................................15

*In re Am.'s Hobby Ctr., Inc.*,
223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998) ..............................................................................8

*In re Archdiocese of Milwaukee*,
483 B.R. 855 (Bankr. E.D. Wis. 2012) ......................................................................................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................................12

*Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*,
No. 94 CIV. 6551 (RWS), 1995 WL 491491 (S.D.N.Y. Aug. 17, 1995) ...........................20, 21

*In re Baker*,
374 B.R. 498 (Bankr. E.D.N.Y. 2007) .....................................................................................15

*In re Big M, Inc.*,
No. 13–10233 DHS, 2013 WL 1681489 (Bankr. D. N.J. Apr. 17, 2013) ...............................18

*Matter of Celotex Corp.*,
196 B.R. 596 (Bankr. M.D. Fla. 1996) ..............................................................................18, 21

*In re Cendant Corp. Sec. Litig.*,
343 F.3d 658 (3d Cir. 2003) .....................................................................................................17

*In re Centaur, LLC*,
No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) ...................10, 11, 15

*Commodity Futures Trading Comm'n v. Weintraub*,
471 U.S. 343 (1985) .................................................................................................................18

*In re Commodore Int'l Ltd.*,
262 F.3d 96 (2d Cir. 2001) .......................................................................................................16

*In re Dewey & Leboeuf LLP*,
No. 12-12321 (MG), 2012 WL 5985445 (Bankr. S.D.N.Y. Nov. 29, 2012) ................9, 10, 16

*In re Evergreen Solar, Inc.*,
No. 11-12590 (Bankr. D. Del. Oct. 28, 2011) .........................................................................16

# TABLE OF AUTHORITIES
## (continued)

*In re Fas Mart Convenience Stores, Inc.*,
  No. 03-CV-359, 2003 WL 22048024 (E.D. Va. June 25, 2003) ............................................11

*In re G-I Holdings, Inc.*,
  2006 WL 1751793 (D. N.J. June 21, 2006) ....................................................................11, 14

*Garner v. Wolfinbarger*,
  430 F.2d 1093 (5th Cir. 1970) .........................................................................18, 19, 20, 21

*In re Gen. Instrument Corp. Sec. Litig.*,
  190 F.R.D. 527 (N.D. Ill. 2000) ..............................................................................19, 20, 21

*In Re Girard Med. Ctr.*,
  No. 90-10804S, 1990 WL 56486 (Bankr. E.D. Pa. Feb. 23, 1990) .........................................11

*In re Grand Eagle Cos., Inc.*,
  310 B.R. 79 (Bankr. N.D. Oh. 2004) ....................................................................................10

*Hickman v. Taylor*,
  329 U.S. 495 (1947) ...........................................................................................................17

*J.H. Chapman Grp., Ltd. v. Chapman*,
  No. 95 C 7716, 1996 WL 238863 (N.D. Ill. May 2, 1996) .............................................20, 21

*Klitzman, Klitzman & Gallagher v. Krut*,
  744 F.2d 955 (3d Cir. 1984).................................................................................................17

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
  244 F.R.D. 412 (N.D. Ill. 2006)....................................................................................20, 21

*Lemelson v. Bendix Corp.*,
  104 F.R.D. 13 (D. Del. 1984) ..............................................................................................19

*In re Leslie Fay Cos. Sec. Litig.*,
  161 F.R.D. 274 (S.D.N.Y. 1995) ..........................................................................................20

*In re Majestic Capital, LTD.*,
  11-36225 (Bankr. S.D.N.Y. Nov. 11, 2011) ..........................................................................16

*In re MIG, Inc.*,
  No. 09-12118, 2009 WL 8662897 (Bankr. D. Del. Dec. 18, 2009)................................7, 12, 13

*In re Nat'l Forge Co.*,
  326 B.R. 532 (W.D. Pa. 2005)..............................................................................................14

*Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman,*
    342 B.R. 416 (S.D.N.Y. 2006)..........................................................................18, 20

*Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp.,*
    544 F.3d 420 (2d Cir. 2008).....................................................................................15

*In re Old Carco LLC,*
    09-50002-SMB (Bankr. S.D.N.Y. Aug. 12, 2009) ..................................................16

*In re Optim Energy, LLC,*
    No. 14-10262 (BLS), 2014 WL 1924908 (Bankr. D. Del. May 13, 2014).............12

*In re Redden,*
    No. 12-51012, 2013 WL 5436368 (Bankr. D. Del. Sept. 30, 2013)...........................8

*Smart World Techs., LLC v. Juno Online Svcs., Inc. (In re Smart World Techs., LLC),*
    423 F.3d 166 (2d Cir. 2005)...............................................................................15, 16

*South Trust Bank N.A. v. Jackson (In re Dur Jac Ltd.),*
    254 B.R. 279 (Bankr. M.D. Ala. 2000)...................................................................14

*Southern Scrap Material Co. v. Fleming,*
    No. CIV.A.01-2554, 2003 WL 21783318 (E.D. La. July 30, 2003) ........................17

*Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.),*
    779 F.2d 901 (2d Cir. 1985)..............................................................................10, 11

*Upjohn Co. v. United States,*
    449 U.S. 383 (1981)...............................................................................................17

*Wachtel v. Health Net, Inc.,*
    482 F.3d 225 (3d Cir. 2007)..................................................................................20

*In re Wash. Mut., Inc.,*
    461 B.R. 200 (Bankr. D. Del. 2011) ........................................................................9

*Infinity Investors Ltd. ex rel. Yes! Entm't Corp. v. Kingsborough (In re Yes! Entm't Corp.),*
    316 B.R. 141 (D. Del. 2004)..............................................................................7, 14

**Statutes**

11 U.S.C. § 1109(b) .......................................................................................................13

# PRELIMINARY STATEMENT[1]

1.    The Committee requests derivative standing to file a Proposed Complaint as part of a calculated strategy to secure a long-term Lease extension for the Debtors' main manufacturing facility. The Committee's ill-conceived pursuit of this litigious course of action comes at a time when the Debtors, key members of the Bondholders' Consortium, and the Landlord are engaged in advanced negotiations that will address many of the issues that have divided the parties since the inception of these chapter 11 cases. Curiously, the Committee—without having given the negotiating parties a chance to finalize the terms of a global consensual deal—instead chooses to charge ahead with its request to litigate in the Debtors' shoes these very same issues. Indeed, if a global consensual settlement is reached, these claims will be essentially rendered moot.

2.    The Committee's request for standing to pursue litigation concerning the Lease against the Landlord and Sciens could not come at a worse possible time. By filing a complaint that fails to establish the required status of "colorable claims," the Committee runs the risk of undermining the fragile progress made in ongoing settlement discussions involving the Landlord.

3.    The Committee has repeatedly argued from the outset that these cases should be resolved through the chapter 11 plan process. But it seemingly misses the point that what the

---

[1]    As used in this brief, (i) "Committee" means the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (see D.I. 130, 327); (ii) "Sciens" means Sciens Capital Management LLC; (iii) "Lease" means the Net Lease between NPA Hartford LLC and Colt Defense LLC dated as of October 26, 2005; (iv) "Landlord" means NPA Hartford LLC, as defined by the Lease; (v) "Bondholders' Consortium" means the Ad Hoc Consortium of Holders of 8.75% Senior Notes due 2017 issued by Colt Defense LLC and Colt Finance Corp.; (vi) "Standing Motion" means the Motion of the Official Committee of Unsecured Creditors for an Order Granting the Committee: (A) Derivative Standing to Assert, Prosecute, and Settle Claims Arising out of the Debtors' Lease of the West Hartford Facility with NPA Hartford LLC; and (B) Authorization to Hold, Assert and, if Necessary, Waive Privileges on Behalf of the estates [D.I. 406]; and (vii) "Proposed Complaint" means the Committee's Draft Complaint for Injunctive Relief and Money Damages, attached as Exhibit 3 to the Standing Motion [D.I. 406-3].

Debtors, Bondholders' Consortium, and Landlord are currently negotiating is a settlement of these cases ***through the Chapter 11 plan process***. Unfortunately, the Committee—without having even seen the terms of a proposed final settlement—is intent on pursuing a strategy that assumes no global settlement and no chapter 11 plan. The danger in allowing the Committee to pursue its claims against the Landlord and Sciens is that their actions could very well jeopardize settlement discussions that are at a very sensitive stage.

4.      Aside from the practical reasons why the Standing Motion should be denied, the Committee's request should also be denied because it has woefully failed to meet its legal burden that it is entitled to any of the relief it seeks, namely, (i) authority to assert claims on the Debtors' behalf, (ii) exclusive authority to settle claims for the Debtors, and (iii) the extraordinary ability to invade as well as waive the Debtors' privilege.

5.      ***First***, to obtain derivative standing, the Committee must demonstrate that the benefits of the proposed claims outweigh the costs, the proposed claims are colorable, and the Debtors unjustifiably refused to pursue the claims—it cannot:

- The Committee does not even address, much less quantify, the cost-benefit calculus of the Proposed Complaint. The cost of pursuing that complaint will be high—both in terms of professional fees and disrupting the ongoing negotiations—while any potential benefits are faint and not imminently realizable. And the Committee is silent about the risk of losing the ability to obtain a consensual deal with the Landlord or greatly increasing future Lease costs.

- The Committee has not shown that the proposed claims are colorable, *i.e.*, that they would survive a motion to dismiss. It simply points to its Proposed Complaint without showing that it contains legally cognizable claims. At the very least, evaluating colorability should be deferred until the Committee completes the discovery it requested on an emergency basis.

- The Committee has not shown that the Debtors unjustifiably refused a request to pursue their proposed claims. In fact, the

Committee never requested that the Debtors pursue the proposed claims that are now before the Court.

6.    **Second,** allowing the Committee exclusive authority to settle claims on behalf of the Debtors' estates would threaten delicate, ongoing negotiations and usurp the Debtors' role as debtors in possession. It is essential that the Debtors remain in control over their destiny by retaining authority to settle their estates' claims—including those related to the Lease. Granting the Committee's request would make it impossible for the Debtors to enter into further extensions of the Lease, sell their rights under the Lease to a third party, or propose a plan of reorganization that includes an extended Lease.

7.    **Third**, the Committee's request to invade the Debtors' attorney-client privilege and work product immunity is overreaching. The Committee rests its claim exclusively on a forty-five-year-old Fifth Circuit case that addressed a shareholders' securities fraud action and had nothing to do with a creditors' committee. Importantly, the Committee does not identify a single case where a committee in the bankruptcy of an operating debtor has been allowed to see documents protected by the near-sacred attorney-client privilege and work product immunity.

8.    What is worse, the Committee has not bothered to explain why it needs the documents or even identified any of the privileged materials it seeks. Nor has the Committee placed any substantive or temporal limitations on its request—it wants everything, including documents that have not yet been created.

\*     \*     \*

9.    The Committee's counsel made no secret that it opposes what it believes the terms of a potential plan may be. But the Committee will have an opportunity to comment on any proposed plan, and unsecured creditors will have an opportunity to vote on it—and they may very well support a plan. If the Committee chooses to object to a plan, it can. But the Debtors

respectfully submit that the Court should not grant the Committee standing to pursue a costly and ill-advised adversary proceeding that may kill the Debtors' best chance for a negotiated resolution, just as that process looks ready to bear fruit.

## BACKGROUND[2]

### *The Debtors' Independent Committee has taken positions adverse to all major constituencies in this bankruptcy.*

10.     On or around June 10, 2015, the Debtors appointed an Independent Committee to avoid conflicts of interest involving Sciens. Under the Independent Committee's direction, the Debtors' professionals have guided the estates through this bankruptcy since it was filed June 14, 2015. At one time or another, the Debtors have pursued strategies and relief to which almost all the key parties-in-interest have objected.

11.     For example, in June 2015, the Debtors moved for Court approval of a DIP financing proposal over the Bondholders' Consortium's objections.[3] When presented with an alternative DIP financing proposal that the Bondholders' Consortium supported (and Sciens opposed), the Debtors, acting at the Independent Committee's direction, accepted the new DIP financing proposal. At the final DIP hearing, Sciens argued against key features of the DIP Financing Agreement—which the Debtors defended because that was in their best interests.[4]

12.     On July 22, 2015, the Debtors filed a motion to take Rule 2004 discovery to investigate possible conflicts of interest involving Sciens and NPA Hartford, again acting at the Independent Committee's direction.[5] Both Sciens and NPA Hartford opposed that discovery.[6]

---

[2]     Unless otherwise noted, all internal citations and quotations are omitted from cited cases.

[3]     *See* Debtors' Motion to Obtain Post-Petition Financing and Other Relief [D.I. 012]; Limited Objection of Sciens Capital Management LLC to Debtors' Proposed Alternative DIP Financing [D.I. 159].

[4]     *See* Sciens's Limited Objection to Debtors' Proposed Alternative DIP Financing [D.I. 159].

[5]     *See* Debtors' Motion for Rule 2004 Discovery from Sciens and NPA Hartford [D.I. 228].

***The Committee asked for permission to***
***conduct discovery to determine whether any***
***claims exist against Sciens or the Landlord.***

13.     The Committee, like the Debtors, filed a motion requesting permission to

propound Rule 2004 discovery on Sciens, its principals, and NPA Hartford.  In support of that

motion the Committee argued that discovery was "necessary to determine whether any claims or

causes of action exist against Sciens, the Landlord, and members of both Sciens and the

Landlord, including for injunctive relief."[7]  The Committee has taken the lead in conducting this

discovery.

14.     At a hearing on July 29, 2015, the Court ordered the parties to meet and confer on

the discovery requests.[8]  While the subpoenaed parties have produced documents, the Committee

has never taken a deposition to this point.  The Committee disputes that it is responsible for any

delay, but the fact is that the Committee has not completed the Rule 2004 discovery it requested.

***Negotiations among the Debtors, the***
***Bondholders' Consortium, Sciens, and***
***NPA Hartford have been fruitful.***

15.     While the Rule 2004 discovery has been proceeding, the Debtors have been

facilitating discussions among the Bondholders' Consortium, Sciens, and NPA Hartford to

develop a framework to reorganize the company.  Through these negotiations, the Debtors

extended the Lease one month and also certain case milestones.  As negotiations progressed, a

long-term Lease extension appears attainable as does a significant and necessary new capital

investment.

---

[6]     *See* Omnibus Objection of NPA Hartford LLC and Valnic Capital Real Estate Fund I LLC to
Rule 2004 Discovery (July 28, 2015) [D.I 275]; Objection of Sciens Capital Management LLC to
Bankruptcy Rule 2004 Motions Filed (July 28, 2015) [D.I. 277].

[7]     The Committee's Emergency Motion for Rule 2004 Discovery directed at Sciens [D.I. 232] and NPA
Hartford [D.I. 233].

[8]     Notice of Agenda of Matters Scheduled for Hearing on July 29, 2015 starting at 9:30 A.M. (EDT)
(July 27, 2015) [D.I. 262]; Minute Entry (July 29, 2015) [D.I. 289].

16.     The Debtors are guided by the Independent Committee, and it cannot be said that the Consortium is in league with Sciens or NPA Hartford. To the contrary, the Consortium has fought with Sciens repeatedly, and its members have more financial skin in the game than anyone, including in their capacity as unsecured creditors who hold nearly $150 million in Senior Notes.[9]

17.     As the Debtors have indicated, negotiations should form the basis of a plan of reorganization that provides meaningful value to unsecured creditors. When a proposal comes to fruition, the Debtors will provide it to the Committee and engage it in substantive dialogue. The Debtors will make every effort to accommodate the Committee's legitimate concerns.

### The Committee seeks derivative standing to assert claims, settle claims, and see privileged and protected material.

18.     On August 17, 2015, the Committee sent the Debtors two letters.[10] One letter asserted that "claims may exist against the Landlord relating to its acts and omissions in connection with the Lease."[11] The other letter asserted that "claims may exist against Sciens and [the Debtors' current and former] Directors and Officers relating to their acts and omissions in connection with the Debtors."[12]

19.     The Committee stated in both letters that due to conflicts of interest, the Debtors could not assert the proposed claims. Without including the Proposed Complaint or otherwise

---

[9]   *See* Amended Joint Verified Statement of Ashby & Geddes, P.A. and Brown Rudnick LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019 [D.I. 167].

[10]  Letter from T. Meyers to P. Friedman (attached as Exhibit 1 to the Standing Motion; hereinafter "Letter 1") [D.I. 406-1]; Letter from T. Meyers to P. Friedman (attached as Exhibit 2 to the Standing Motion, hereinafter "Letter 2") [D.I. 406-2].

[11]  Letter 1 at 1.

[12]  Letter 2 at 1.

identifying specific claims, the Committee requested that the Debtors consent to its derivative standing.[13] The Committee demanded a response within two business days.

20.    On August 28, 2015, without waiting for a formal response to the letters, the Committee filed the Standing Motion on shortened notice. The Standing Motion requests derivative standing to assert, prosecute, and settle claims against Sciens, NPA Hartford LLC, NPA Management LLC and their principals, and asks the Court authorize the Committee to hold, assert, and waive privileges on the estates' behalf. The Proposed Complaint attached to the Standing Motion asserts six claims for relief. According to the Committee, "resolution of the lease" is "[a] critical issue."[14] On that issue, the Committee is correct.

## ARGUMENT

21.    The Committee asks for authority to (i) assert claims on the Debtors' behalf; (ii) settle claims for the Debtors; and (iii) invade, as well as waive, the Debtors' privileges and immunities. But the Committee does not carry its burden of satisfying the following three independent elements for derivative standing:

- *First*, the Committee must establish that its claims offer a "likely benefit to the estate" such that the Court can "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *In re MIG, Inc.*, No. 09-12118, 2009 WL 8662897, at *2 (Bankr. D. Del. Dec. 18, 2009) (quoting *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 906 (2d Cir. 1985)).

- *Second*, the Committee must demonstrate that its proposed claims are colorable—*i.e.*, that they would survive a motion to dismiss. *Infinity Investors Ltd. ex rel. Yes! Entm't Corp. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004).

- *Third*, the Committee must show that the Debtors unjustifiably refused to pursue the proposed claims. *In re Yes!*, 316 B.R. at 145.

---

[13]    *Id.*; Letter 1 at 1.

[14]    Standing Motion ¶ 4.

Other than impugning the Debtors' motives, the Committee has not provided any details about the likely costs or benefits of its proposed claims, has failed to demonstrate that the Proposed Complaint would survive a motion to dismiss, and never even asked the Debtors to pursue the specific proposed claims. Nor does relevant precedent support the Committee's overreaching requests to usurp the Debtors' right to settle claims or invade the Debtors' privilege.

**I.     THE COMMITTEE HAS NOT DEMONSTRATED ANY OF THE ELEMENTS REQUIRED FOR DERIVATIVE STANDING.**

**A.     The Committee has not established that the benefit of pursuing its proposed claims would outweigh the high cost of litigation or provide a better outcome than a negotiated solution.**

22.     A cost-benefit analysis is critical here because pursuing the proposed claims now risks blowing up negotiations to resolve these bankruptcy cases. The Committee's proposed lawsuit may even cause NPA Hartford to walk away from negotiations and commence eviction proceedings, as its counsel stated in Court on September 3, 2015. This is the last thing the Debtors need. Diverting the estates' limited resources to pursue the Committee's claims would impair the Debtors' ability to negotiate a complete resolution of these cases.

23.     The Committee does not address these issues nor does it try to demonstrate that the likelihood of success and the potential benefits of litigation outweigh the costs. As Judge Walsh observed, "[w]ithout an argument that granting standing would benefit the bankruptcy estate, derivative standing is necessarily improper." *In re Redden*, No. 12-51012, 2013 WL 5436368, at *3 (Bankr. D. Del. Sept. 30, 2013); *see also In re Am.'s Hobby Ctr., Inc.*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998) ("The mandated cost/benefit analysis involves the weighing of the probability of success and financial recovery. . . . [A] sufficient likelihood of success must be found to justify the anticipated delay and expense to the bankruptcy estate"); *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 386 (Bankr. S.D.N.Y 2005) (pursuing colorable claims must be

a "sensible expenditure of estate resources"). So too here. The Committee has provided only generalized and conclusory assertions about purported benefits.

> *i.* *The Committee's proposed litigation*
> *would be messy, costly, and lengthy.*

24. The "first element of a cost-benefit analysis is cost." *In re Archdiocese of Milwaukee*, 483 B.R. 855, 869 (Bankr. E.D. Wis. 2012) (denying derivative standing where committee failed to demonstrate that benefit of litigation would exceed costs). But the Committee has made no effort to quantify the cost of pursuing its proposed claims. Even under the most optimistic circumstances, the costs associated with pursuing the Committee's proposed claims will be high. The Committee's legal fees will be substantial, not to mention the fees of other parties-in-interest. Indeed, the Standing Motion (including the request to shorten notice) is on track to generate many briefs and two hearings. *See In re Wash. Mut., Inc.*, 461 B.R. 200, 267 (Bankr. D. Del. 2011) (noting that the "vigor[ous]" opposition to the standing motion was itself a suggestion that any subsequent proceedings would result in "a litigation morass").

25. Moreover, the claims that the Committee wishes to assert cannot be quickly resolved. At the very least, litigating the Proposed Complaint, which is some 225 pages with exhibits, will require extensive discovery—including depositions, written requests, and document review. There will undoubtedly be discovery disputes and motion practice. Before all that starts there may well be at least one round of motions to dismiss, perhaps more.

26. The Committee does not mention how costly litigation fits within these cases' budget. *In re Dewey & Leboeuf LLP*, No. 12-12321 (MG), 2012 WL 5985445, at *7 (Bankr. S.D.N.Y. Nov. 29, 2012) ("the terms relative to attorneys' fees on which suit might be brought are relevant to the evaluation of whether prosecution of the claims is in the best interests of the estate"). Nor has it proposed a contingency or other alternate fee arrangement based on

recoveries from its Proposed Complaint. *See In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) (granting derivative standing but requiring the committee to work on a contingency basis); *In re Dewey & Leboeuf LLP*, 2012 WL 5985445, at *7 (pursuing claims on a contingency basis would alleviate cost concerns).

27.     Because the Committee has provided no plan for its professional fees, these must be incorporated into any cost analysis. *In re STN Enters.*, 779 F.2d at 905–06 ("[I]mpos[ing] such fees on other creditors or the chapter 11 estate, whether by contingency fee arrangement or otherwise, [] would obviously affect the cost-benefit analysis the court must make in determining whether to grant lease to sue."); *accord In re Grand Eagle Cos., Inc.*, 310 B.R. 79, 99 (Bankr. N.D. Oh. 2004) ("Given that the fees are not to be borne by the estate, the cost of pursuing this litigation is likely to be, although not small, relatively insignificant in comparison to the potential recovery for the Debtors' estate."). And given the estates' limited resources, if the Court were to grant the Committee even some limited form of standing, it should require the Committee to pay for the cost of litigating its complaint.

28.     The Committee's proposed route also has costs that cannot be calculated now, but could be even more severe than draining the Debtors' budget. For example, the Committee may lose the litigation and irreparably damage the Debtors' relationship with its Landlord and make obtaining an extension impossible. Even if an extension can be obtained, any litigation costs the Landlord incurs will likely be reflected in future rent hikes. The Committee does not appear to recognize these costs—much less have a solution for how to address them.

> ii.     *The Committee has not demonstrated that*
> *pursuing its claims would benefit the estates.*

29.     Instead of quantifying how its proposed claims would benefit the estates, the Committee states as a conclusion that, if successful, its claims would provide "viable and

valuable assets" to the estates.[15]  Below is the sum total of what the Committee says about the

benefit to the estates of pursuing the proposed claims:

> The Committee respectfully submits that the Claims detailed in the
> Proposed Complaint represent viable and valuable assets of the
> Estates which, if successfully prosecuted, will, among other things,
> preserve the Lease for the benefit of the Debtors and their Estates
> and also provide a monetary recovery for the Estates, which will
> ultimately inure to the benefit of the unsecured creditors of the
> Debtors in these bankruptcy cases.[16]

30.     The Committee's conclusory assertions are insufficient to determine potential

benefits to the estates from costly litigation.  Instead, a "cost-benefit analysis requires detailed

factual findings." *In re G-I Holdings, Inc.*, No. 04-3423, 2006 WL 1751793, at *11 (D. N.J.

June 21, 2006); *In re STN Enters.*, 779 F.2d at 905 (the court must "examine on affidavit and

other submission, by evidentiary hearing or otherwise, whether an action asserting such a

claim(s) is likely to benefit the reorganization estate"); *In re Fas Mart Convenience Stores, Inc.*,

No. 03-CV-359, 2003 WL 22048024 (E.D. Va. June 25, 2003) ("the Bankruptcy Court must

make specific factual findings regarding . . . whether the claim, if successful, will benefit the

estate").  The Committee offers no basis to conclude that there is a meaningful benefit to the

estates here—and certainly not one that exceeds the costs and risks of litigation described above.

31.     On the other hand, the Debtors are negotiating for the same results that the

Committee seeks through litigation: a long-term Lease extension and new capital investment.  In

the Debtors' business judgment, negotiation is the best way to maximize value for the estates.

*See In Re Girard Med. Ctr.*, No. 90-10804S, 1990 WL 56486 (Bankr. E.D. Pa. Feb. 23, 1990)

("A debtor-in-possession is accorded great deference as to its business judgments.").

---

[15]   *See In re Centaur*, 2010 WL 4624910, at *7 (Committee failed to provide "an adequate basis for
quantifying, with any reasonable certainty (even within a range), potential benefit to the estate," and
therefore could only pursue colorable claims on a contingency basis).

[16]   Standing Motion ¶ 17.

32.     The Standing Motion should also be denied because no one can determine whether the proposed claims are colorable, much less whether they are likely to succeed. Without having addressed the likelihood of success, the Committee cannot show that the potential benefits of pursuing its proposed claims justify the extensive costs. This is of paramount importance here, where the cost of failure is substantial.

**B.      The Committee has not established that its proposed claims are colorable.**

33.     The Committee has not established that the proposed claims are colorable. *In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 WL 1924908 at *6 (Bankr. D. Del. May 13, 2014) (denying request for standing because "the moving party must demonstrate that . . . the moving party has alleged colorable claims," and creditor "failed to articulate colorable claims"). A claim is colorable if it would survive the standard of scrutiny applicable to a motion to dismiss for failure to state a claim. *Id.* Mere "labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, a party must plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663.

34.     Put another way, unless the Committee offers some factual meat, the Court has no basis to conclude that the proposed claims would survive a motion to dismiss. But the Committee does not explain why its proposed claims would survive a motion to dismiss. Nor does the Committee cite law establishing the claims' basic elements or whether they are judicially cognizable.

35.     As Judge Gross did in *In re MIG, Inc.*, this Court should decline ruling on the proposed claims' colorability unless there is first some evidence as to the "likelihood of

success." No. 09-12118 (KG), 2009 WL 8662897, at *2 (Bankr. D. Del. Dec. 18, 2009). If after discovery is complete and plan negotiations do not bear fruit, and the Court is so inclined, it might be useful, as in *In re MIG*, to hold an evidentiary hearing on whether the Proposed Complaint is likely to yield any benefit to the estates.

### C.   The Debtors did not unjustifiably refuse to pursue the proposed claims.

36.     The Standing Motion fails for the separate and independent reason that the Debtors did not unjustifiably refuse a request to pursue the Proposed Complaint. The Debtors could not have refused because the Committee never asked them to pursue the proposed claims that are the subject of the Standing Motion.

37.     That the Debtors did not respond to the Committee's letters is beside the point because it never requested that the Debtors assert the claims in the Proposed Complaint. The Committee's two letters merely described the claims in perfunctory terms—without attaching the Proposed Complaint. On top of that, one of the Committee's letters confusingly asked for consent to assert defenses concerning Lease eviction proceedings (that have not been commenced), which is nonsensical because if the Landlord were to try and evict the Debtors, the Committee—as well as the Debtors—would be able to raise any arguments it chose under section 1109(b) of the Bankruptcy Code. *See* 11 U.S.C. § 1109(b) ("a creditors' committee . . . may raise and may appear and be heard on any issue in a case under this chapter").

38.     In what amounts to an acknowledgement that it neglected to ask the Debtors to pursue its proposed claims, the Committee asserts that the demand requirement should be waived because demand would be futile.[17] But as the Committee's own cases demonstrate, the demand requirement may be waived only when a debtor cannot reasonably assert the claims. In *National*

---

[17]   Standing Motion ¶¶ 31–32.

*Forge Company*, on which the Committee relies, the debtor expressly waived its right to assert the claims at issue. 326 B.R. 532, 545 (W.D. Pa. 2005). There the court also noted that the debtor would have difficulty asserting the claims because the committee wanted to sue all of the debtor's "key employees." *Id.* That is obviously not the case here because the Debtors did not waive that right and have an Independent Committee to authorize litigation.

39. The Committee's reliance on *G-I Holdings, Inc.*, is similarly misplaced. 313 B.R. 612 (Bankr. D. N.J. 2004).[18] There, a committee sought derivative standing to bring an avoidance action. Although the court found that the committee had not requested that the debtors pursue the avoidance, it held that such a request would have been futile because the debtors had previously filed a motion adverse to the committee's position in the proposed complaint. *Id.* at 630. Here, the reverse is true. The Debtors, like the Committee, sought discovery from the proposed defendants to investigate concerns that Sciens has potential conflicts of interest.[19]

## II. NO LAW SUPPORTS THE COMMITTEE'S OVERREACHING REQUEST FOR EXCLUSIVE AUTHORITY TO SETTLE CLAIMS.

40. The Debtors must retain the ability to settle or otherwise dispose of their estates' claims—including those related to the Lease—whether through an asset sale or a chapter 11 plan. Granting the Committee's requested relief—effectively to deal with all aspects of the Lease—would make it impossible for the Debtors to enter into further extensions of the Lease,

---

[18] The remaining cases that the Committee cites are even further off target. *See In re Yes!*, 316 B.R. at 145 (waiving demand requirement was not necessary because trustee initially "refused to act" but subsequently supported derivative standing motion); *South Trust Bank N.A. v. Jackson (In re Dur Jac Ltd.)*, 254 B.R. 279, 286 (Bankr. M.D. Ala. 2000) ("filing suit against [one's] own children and stepchildren [creates an] obvious conflict of interest" that excused the demand requirement).

[19] Debtors' Motion for an Order under Bankruptcy Rule 2004 Authorizing Discovery from Sciens Capital Management LLC and NPA Hartford LLC. [D.I. 228] ("Debtors' 2004 Motion").

sell their rights under the Lease, or propose a plan that includes an extended Lease. This is inconsistent with the very concept of the "debtor in possession."

41.     As a matter of law, even if the Court authorizes the Committee to pursue claims, the Committee would not be entitled to exclusive authority to settle claims on the Debtors' behalf. A "grant of derivative standing does not strip a debtor of ownership of the [c]laims." *In re Centaur*, 2010 WL 4624910, at *7. "[A]ccordingly, the Debtors continue to have the right, subject to Court approval, to settle" claims even if standing is granted to a third party to pursue them. *Id.* "Consistent with the debtor-in-possession's role as legal representative of the bankruptcy estate," Bankruptcy Rule 9019 authorizes only the debtor-in-possession to settle the estate's claims. *Smart World Techs., LLC v. Juno Online Svcs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 174 (2d Cir. 2005) (reversing bankruptcy court's order giving creditor committee authority to compromise claims on behalf of the estate).

42.     A party that "seeks to displace the debtor" from its position as the party that can settle estate causes of action "faces a heavy burden." *In re Baker*, 374 B.R. 498, 503 (Bankr. E.D.N.Y. 2007). Accordingly, courts protect a debtor's settlement authority even where a creditor or committee is authorized to pursue claims on behalf of the estate. *See, e.g., In re Centaur*, 2010 WL 4624910, at *7 ("While granting the Committee standing includes authority to settle its Claims, subject to Court approval, that authority is not exclusive."); *In re Adelphia Commc'ns Corp.*, 371 B.R. 660, 670–71 (S.D.N.Y. 2007) ("a debtor-in-possession may assert control over an adversary proceeding notwithstanding a committee's derivative standing"); *aff'd* 544 F.3d 420, 424 (2d Cir. 2008) (derivative standing does not "undermine the debtor's central role in handling the estate's legal affairs," nor does a committee's "control of the estate's claims rival[] that of the debtor-in-possession").

43. The Committee has not attempted to justify stripping the Debtors of authority to settle claims. This failure is even more striking in light of how central the Lease is to selling assets or formulating a plan—both of which are core debtor functions.

44. In the face of significant authority establishing that a debtor retains the right to settle estate causes of action, the Committee asserts that similar relief has been granted by a number of other courts in connection with conferring derivative standing on creditors' committees.[20] But its authority is inapplicable: in *every* case the Committee cites, the debtor did ***not object*** to the committee's request. Moreover, each one involved a liquidating chapter 11 case. Certainly, none involved a request to settle issues at the heart of an operating debtor's reorganization.[21] For these reasons, the Debtors should retain the right to resolve or settle any causes of action that the Court grants the Committee standing to pursue.

---

[20] Standing Motion at ¶ 47.

[21] *See In re Dewey & Leboeuf LLP*, 2012 WL 5985445, at *1 ("The Debtor has consented to the Unsecured Committee obtaining derivative standing to prosecute these claims on behalf of the Debtor's estate"); Motion for Entry of an Order (I) Authorizing the Official Committee of Unsecured Creditors to (A) Assert and Prosecute Certain Claims and Causes of Action in the Name of and on Behalf of the Debtors' estates, and (B) Move for Authority to Compromise any Such Claims and Causes of Action, and (II) Granting Related Relief, *In re Majestic Capital, LTD.*, 11-36225 (Bankr. S.D.N.Y. Nov. 11, 2011), ECF No. 173 (same, noting that the committee "took the lead" in pursuing claims "because the Debtors have been in a 'wind down' mode since the Petition Date and have been focused primarily upon completing their joint plan of liquidation"); Order Granting Leave, Standing and Authority to the Official Committee of Unsecured Creditors of Evergreen Solar, Inc. to Commence, Prosecute, and Settle Claims on Behalf of the Debtor's estate and Related Relief, *In re Evergreen Solar, Inc.*, No. 11-12590 (Bankr. D. Del. Oct. 28, 2011) [D.I. 382] (same); Reply of the Official Committee of Unsecured Creditors in Further Support of its Motion for an Order Authorizing it to Pursue Certain Claims on Behalf of the Estate of Debtor Old CarCo LLC, *In re Old Carco LLC*, 09-50002-SMB (Bankr. S.D.N.Y. Aug. 12, 2009), ECF No. 5124 (same). Thus, while courts have given creditor committees exclusive settlement authority based on the consent of the debtor-in-possession, *see, e.g.*, *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001), that exception "has been held inapplicable," where, as here, the Debtor "obviously does not consent" to that authority, *In re Smart World Techs., LLC*, 423 F.3d at 176 (reversing bankruptcy court's grant of settlement authority).

**III.** **Nor does any law support the Committee's overreaching request to invade the Debtors' privilege.**

45. Not content to usurp the Debtors' right to settle claims, the Committee asks the Court for the right to invade—and even waive—the Debtors' attorney-client privilege and work product immunity. But it cites no authority justifying this extraordinary relief and fails to demonstrate that the materials it seeks are necessary or even relevant to its claims. In fact, the Committee has not provided any details about the documents and information it requests.

**A.** **The attorney-client privilege and work product immunity are sacrosanct and should not be cast aside.**

46. The Committee asserts—in a footnote—that "any grant of derivative standing would necessarily vest the Committee with authority to hold, assert, and if necessary, waive the Privileges."[22] The Committee is wrong. The attorney-client privilege is the oldest communication privilege that the law recognizes. *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 960 (3d Cir. 1984); *see also Southern Scrap Material Co. v. Fleming*, No. CIV.A.01-2554, 2003 WL 21783318, at *1 (E.D. La. July 30, 2003) ("The confidential relationship between lawyer and client is sacrosanct and one of the bastions of an ordered liberty."). The privilege serves the public interests by encouraging full and frank communications between client and counsel. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

47. The same is true for the work-product doctrine—an attorney's thoughts are inviolate, because otherwise "[i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947); *see also In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003) (acknowledging "the essential nature of the [work-product] doctrine" and

---

[22] Standing Motion at 11 n.9.

reversing discovery order because confidential communications made in anticipation of litigation "are only discoverable upon a showing of rare and exceptional circumstances").

48.    In bankruptcy, the debtor in possession owns the attorney-client privilege. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 354–56 (1985). Indeed, the Committee's own authority holds that a creditors' committee does not have the power over a debtor's attorney-client privilege. *See Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416, 423 (S.D.N.Y. 2006). This is true even when the committee has been granted derivative standing:

> While courts have recognized that a debtor's right to assert or waive the attorney-client privilege against discovery is passed to the estate or an appointed trustee upon filing for bankruptcy, or the subsequent appointment of a trustee, ***such a power does not extend to a creditors' committee that asserts causes of action on behalf of the estate.***

*In re Big M, Inc.*, No. 13–10233 DHS, 2013 WL 1681489, at *1 (Bankr. D. N.J. Apr. 17, 2013).

**B.    No authority supports the Committee's claim that derivative standing necessarily occasions a privilege waiver.**

49.    Ignoring *Weintraub*, the Committee points exclusively to *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970)—a forty-five-year-old Fifth Circuit case that addressed a shareholders' securities fraud claim and had nothing to do with creditor committee claims. *See Matter of Celotex Corp.*, 196 B.R. 596, 600 n.3 (Bankr. M.D. Fla. 1996) (declining to apply *Garner* in adversary proceeding against debtor's insiders because shareholder derivative securities litigations is "clearly distinguishable" from bankruptcy adversary cases). Importantly, no reported case in this circuit has applied *Garner* to allow a committee in bankruptcy to invade a debtor's attorney-client privilege—prospectively, no less—absent consent or waiver. And *Garner* does not apply to the work product doctrine. *Id.*

50. Moreover, the Committee is flat wrong in claiming that *Garner* creates an automatic right to invade privilege as an incident to derivative standing. Rather, it allows a party owed a fiduciary duty the opportunity "to show cause why [a privilege] should not be invoked in the particular instance." 430 F.2d at 1103–04. The Committee's own brief makes clear that there is nothing automatic about *Garner*, as evidenced by the multi-factor test that case articulates to determine whether privilege should be lifted.[23]

**C.    Even on the Committee's theory of the law, the Debtors' privilege should not be invaded.**

51. The Committee cannot show "good cause" for overcoming the attorney-client privilege. *See In re Gen. Instrument Corp. Sec. Litig.*, 190 F.R.D. 527, 529 (N.D. Ill. 2000); *see also Lemelson v. Bendix Corp.*, 104 F.R.D. 13, 16–17 (D. Del. 1984) (the party seeking to overcome the attorney-client privilege bears the burden of showing an exception applies).

52. Good cause has four key components: (i) colorability of the underlying claims; (ii) unavailability of the information from other sources; (iii) extent to which the information sought is limited to past actions; and (iv) risk that producing the information would reveal confidential business information. *In re Gen. Instrument Corp. Sec. Litig.*, 190 F.R.D. at 529.

(i)    As discussed in Point I.B above, the Committee has failed to demonstrate the colorability of its claims.

(ii)   The Committee has not identified a single specific document it seeks that is unavailable elsewhere. The Committee has not even described the category of information it seeks.

(iii)  The Committee has placed no temporal or substantive limit on the extent of privileged material it seeks. Indeed, the Proposed Complaint is not limited to past actions. For example, the Committee alleges that the proposed defendants continue to breach their fiduciary duties.[24] The Committee's failure to place any limitation on the scope of its requested

---

[23]    Standing Motion ¶ 40.

[24]    Proposed Complaint ¶ 107 ("The Aiding and Abetting Defendants are working in tandem with the Fiduciaries to withhold an extension of the Lease to enable the Fiduciaries to reap the benefits of their breaches of duties.").

privilege waiver and the nature of the proposed claims suggests that the materials the Committee will seek will not be limited to past actions. Under the Committee's formulation, it would perversely get to see its adversaries' material related to the proposed litigation. *See Wachtel v. Health Net, Inc.*, 482 F.3d 225, 233 (3d Cir. 2007) ("under the liability exception, a fiduciary, seeking the advice of counsel for its own personal defense in contemplation of adversarial proceedings against its beneficiaries, retains the attorney-client privilege [even under *Garner*].").

(iv)    Invading the privilege would reveal confidential business information. The Committee's proposed claims focus on how the estates' business has been managed, weaving in privileged documents with confidential business information. The Committee also argues that disclosing "privileged information to the Committee shall not constitute a waiver . . . with respect to any other party."[25] But the Committee cites no law for this and expressly requests the right to waive the Debtors' privilege.[26]

**D.    The Committee asks to see all of the Debtors' privileged documents, including those that have not yet been created.**

53.    Even cases that have allowed invading privilege acknowledge that "an equitable piercing of the attorney-client privilege should be narrowly tailored to address the potential prejudice to the party attacking the privilege." *In re Leslie Fay Cos. Sec. Litig.*, 161 F.R.D. 274, 284 (S.D.N.Y. 1995). Indeed, the Committee's own cases involve parties that sought disclosure of specific documents.[27] The Committee also cites a case where the court lifted the privilege because the party withholding it had not demonstrated that the material was privileged.[28]

---

[25]    Standing Motion at ¶ 46.

[26]    Standing Motion at ¶ 5 ("The Committee further requests that this Court give it the authority to . . . waive the Privileges as part of this process.").

[27]    *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 244 F.R.D. 412, 425 (N.D. Ill. 2006) (requesting documents identified on privilege log); *G-I Holding*, 342 B.R. at 419 (same); *Asian Vegetable*, 1995 WL 491491, at *3 (requesting inadvertently-produced privileged documents); *J.H. Chapman Grp., Ltd. v. Chapman*, No. 95 C 7716, 1996 WL 238863, at *1 (N.D. Ill. May 2, 1996) (requesting specific documents and deposition testimony from outside counsel).

[28]    *See Gen. Instrument Corp.*, 190 F.R.D. at 530 ("[D]efendant's privilege log is sketchy at best. . . . We can select, almost at random, any entry in the log and be unable to determine how it meets the elements of attorney-client privilege.").

Moreover, with just one (distinguishable) exception, the Committee cites exclusively non-bankruptcy cases from outside this circuit.[29]

54.     In short, none of the Committee's cases is relevant here—none is from this circuit, none finds support in this circuit, and none support the Committee's overreaching and indiscriminate request in this case.

*[Remainder of page intentionally left blank.]*

---

[29]     *See Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, No. 94 CIV. 6551 (RWS), 1995 WL 491491, at *6 (S.D.N.Y. Aug. 17, 1995) (breach of contract case where the court found that *Garner* did not apply because even if a fiduciary relationship existed, the communications arose after the relationship ended); *In re Gen. Instrument Corp. Sec. Litig.*, 190 F.R.D. at 527 (derivative securities litigation case, which is plainly distinguishable from bankruptcy creditor committee adversary case, see *Celotex*, 196 B.R. at 600 n.3); *Lawrence E. Jaffe Pension Plan*, 244 F.R.D. at 423 (securities litigation case where court allowed plaintiffs to obtain E&Y documents created for defendants' in-house counsel, but stressed the "significanc[e]" of the fact that E&Y is not a law firm and cautioned that its holding must be interpreted narrowly); *Chapman*, 1996 WL 238863 (allowing narrow exception in trademark infringement claim against a company founder who left to form a rival investment firm).

## CONCLUSION

55. For the above reasons, the Court should deny the Standing Motion and grant such other and further relief and it deems just and proper.

Dated: September 10, 2015
Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

**O'MELVENY & MYERS LLP**
John J. Rapisardi (admitted *pro hac vice*)
Peter Friedman (admitted *pro hac vice*)
Gary Svirsky (admitted *pro hac vice*)
Joseph Zujkowski (admitted *pro hac vice*)
Times Square Tower
Seven Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for the Debtors*
*and Debtors in Possession*